# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JUSTIN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-00336-RAH-JTA |
| | ) | |
| WAAWAATESI LLC, | ) | |
| d/b/a GREENLINE LOAN, *et al.* | | |

---

### Declaration of John Johnson, Sr.

---

John Johnson, Sr., does hereby declare under penalty of perjury:

1.      I am the President of the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Tribe") and I am authorized to make this Declaration on behalf of the Tribe.

2.      I reside on the Lac du Flambeau Indian Reservation in the State of Wisconsin.

3.      I am a tribal member of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

4.      Under the Constitution and Bylaws of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin, the Tribal Council is the governing body of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

5.      A true and accurate copy of the Constitution and Bylaws of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin is attached hereto as **Exhibit 2**.

6.      In my capacity as President, I serve as a member of the Tribal Council and the head of the Executive Council.  In 2014, I was elected to my first two-year term as Tribal Council Member.  In 2016, I was elected to my first two-year term as Tribal Council Vice-President and served until 2018.  In 2019, I was elected to my second two-year term as Tribal Council Member.

On October 6, 2020, I was elected to my first two-year term as Tribal Council President where I replaced Joseph Wildcat, Sr., a named Defendant in this case.

7. The Tribal Council President's Office is located in the Lac du Flambeau Tribal Office, which is on the Lac du Flambeau Indian Reservation in the State of Wisconsin. I conduct my work as Tribal Council President from the Lac du Flambeau Tribal Office. I do not conduct my work as Tribal Council President on state lands, except as it pertains to intergovernmental relations. I do not conduct work pertaining to tribal economic development on state lands.

8. In my capacity of President of the LDF Tribal Council, I have knowledge of the Tribe and its entities, including the following:

  a. In August 2012, the LDF Tribal Council, on behalf of the Tribe, created the L.D.F. Business Development Corporation ("BCD"). The BDC was created as a wholly-owned economic arm of the Tribe for the purpose of creating jobs and generating revenue to contribute to the Tribe's general fund, among other things. The BDC is governed by a Board of Directors, which consists of the Tribal Council. All subsidiary companies of the BDC report to the Board of Directors. The Directors, individually, have no power to act on behalf of the BDC.

  b. The Tribal Council, on behalf of the Tribe, enacted Chapter 44a of the Lac du Flambeau Tribal Code, which authorizes and governs the creation of tribal limited liability companies.

  c. A true and accurate copy of Chapter 44a of the Lac du Flambeau Tribal Code is attached hereto as **Exhibit 3**

  d. The Tribal Council, on behalf of the Tribe, enacted the Lac du Flambeau Tribal Consumer Financial Services Regulatory Ordinance ("Ordinance"), which

2

authorized lending over the internet provided that such internet lending is consistent with applicable federal and Tribal laws and regulations.

e. A true and accurate copy of the Lac du Flambeau Tribal Consumer Financial Services Regulatory Ordinance is attached hereto as **Exhibit 4**.

f. The Ordinance authorized businesses wholly owned by the Tribe to engage in consumer financial services and also established the Tribal Consumer Financial Services Regulatory Authority, which was Agents that are employees of the Tribe and regulate the Tribe's online consumer financial services.

g. After creating the BDC, the Tribal Council, on behalf of the Tribe, created LDF Holdings, LLC ("Holdings") for the purpose of, among other things, engaging in consumer financial services through the creation and operation of subsidiaries.

h. Holdings has numerous subsidiaries that issue online short term loans, which Holdings is the sole member of those subsidiaries.

i. The Tribe's online consumer financial services businesses provides jobs to Tribal and community members, among other things.

j. Holdings' subsidiaries, through the BDC, distributes profits to the Tribe's general fund, which supports the Tribal government, including programs and services for Tribal members and the surrounding community, including, but not limited to, the following:

    i. Law enforcement;

    ii. Water and sewer services;

    iii. Clinical medical and dental care;

    iv. Natural resources management;

3

     v.   Public roads management;

    vi.   Wildlife conservation;

   vii.   Fire and ambulance service (joint effort with local government);

  viii.   Land management;

    ix.   Early childhood education;

    x.   General assistance programs, including low-income housing and food distribution; and

   xi.   Domestic-abuse protective services.

k. Without revenue generated from Holdings' subsidiaries, the Tribal Council would have to cut funding to these essential governmental services.

9. The Tribe has a direct interest related to the subject matter of this action because the Plaintiffs seek to invalidate loans that were issued by the Tribe, through Holdings' subsidiaries.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 17, 2022

John Johnson, Sr.

# Exhibit 2

# CONSTITUTION AND BYLAWS OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS OF WISCONSIN

## PREAMBLE

We, the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin, grateful to Almighty God for our freedom, in order to secure its blessings, to re-establish our tribal organization, to conserve and develop our common resources, to establish a credit system and to promote the welfare of ourselves and our descendants, hereby ordain and establish this Constitution.

## ARTICLE I - TERRITORY - JURISDICTION

Section 1.    The territory of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin shall be all the land and water within the original confines of the Lac du Flambeau Reservation as defined pursuant to the Treaty dated September 30, 1854 (10 Stat. 1109), and to such other lands and waters that have been added or may hereafter be added thereto under law of the United States, except as otherwise provided by Federal law.

Section 2.    The jurisdiction of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin shall extend to all the land and water areas within the territory of the Band, and further, for the purpose of exercising and regulating the exercise of rights to hunt, fish, trap, gather wild rice and other usual rights of occupancy, such jurisdiction shall extend to all lands and waters described in treaties to which the Band was a party, which treaties provide for such rights.

## ARTICLE II - MEMBERSHIP

Section 1.    (a)    All persons whose names appear on the official roll of the Lac du Flambeau Band of April 8, 1953, as approved by the Deputy Commissioner of Indian Affairs on November 13, 1964, shall be members of the Tribe.

(b)    All persons gaining membership subsequent to April 8, 1953, in accordance with ARTICLE II of the Constitution, as amended on September 10, 1982, and the June 9, 1969 Membership Ordinance shall be members of the Tribe.

Section 2.    (a)    Any child of one-fourth (1/4) degree or more Lac du Flambeau Chippewa Indian Blood born to any member of the Tribe shall be entitled to membership.

(b)    Application for membership shall be submitted by the applicant or his parent or guardian to a Committee on Membership, which shall pass upon them and present them to the Tribal Council for final action.

Section 3.       Any person enrolled in any other Indian Tribe shall not be a member of the Lac du Flambeau Band.

Section 4.       Any lineal descendent of a member of the Lac du Flambeau Band may be adopted as a member by the Tribal Council, provided that such person shall possess one-fourth (1/4) degree or more of Lake Superior Chippewa blood.

Section 5.       Vested property rights shall not be acquired or lost through membership in this organization except as provided herein.

## ARTICLE III - THE GOVERNING BODY

Section 1.       The governing body of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin shall be the Tribal Council.

Section 2.       The Council shall consist of a President, Vice-President, Secretary, Treasurer, and eight (8) additional members.  The officers and councilmen shall be nominated and elected by popular vote as provided in Article IV of this Constitution.

Section 3.       The President, Vice-President, Secretary, and Treasurer shall act as the Executive Council of the Tribal Council, to which the Tribal Council may delegate such administrative power as it shall see fit.

Section 4.       No person shall be a candidate for membership on the Tribal Council unless he/she shall be an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin, at least twenty-five (25) years of age, a resident of the reservation for at least one year preceding the date of the election and at least one-quarter (1/4) degree of Lac du Flambeau Chippewa Indian blood.

## ARTICLE IV - NOMINATIONS AND ELECTION

Section 1.       The first election of a Tribal Council of twelve members under this Constitution shall be called and supervised by the Constitution Committee as now constituted, within thirty (30) days after the ratification of this Constitution and Bylaws, and thereafter elections of six (6) councilmen shall be held every year on the first Tuesday in October.

Section 2.       Immediately after the first election the Council shall meet and choose by lot two officers and four councilmen who shall serve until the next annual election, the remaining officers and councilmen to serve until the second annual election.  After the first election, officers and councilmen shall be elected for two years and serve until their successors are elected and qualified.

Section 3.       The Tribal Council shall determine rules and regulations governing all elections following the State of Wisconsin procedure as far as practicable.

Section 4.        Any qualified member of the Tribe may become a candidate for membership in the Council by notifying the Secretary of the Tribal Council in writing of his candidacy at least fifteen days prior to the election.  It shall be the duty of the Secretary of the Tribal Council to post at least ten (10) days before the election, the names of all candidates for the council.

Section 5.        The Tribal Council, or a board appointed by the Council, shall certify to the election of the members of the Council immediately after the election returns.

Section 6.        Any member of the Tribe who is eighteen (18) years of age or over and who presents himself at the polls on election day shall be entitled to vote.

## ARTICLE V - VACANCIES AND REMOVAL FROM OFFICE

Section 1.        If a councilman or official shall die, resign, permanently leave the reservation, or to be removed from office, the Council shall declare the position vacant and appoint a successor to fill the unexpired term, PROVIDED, that the person chosen to fill such vacancy shall be qualified.

Section 2.        Members of the Tribal Council or other elected officials of this organization may be removed from office for improper conduct or gross neglect of duty upon petition signed by twenty-five (25) or more members of the organization, stating their reasons for such removal.  The Tribal Council shall consider such complaint and if deemed sufficient for removal, the Council shall appoint an impartial committee composed of five (5) members of the Tribe, none of whom shall be a member of the Council or one of the signers of the petition, who shall immediately proceed to investigate and report to the Council.  The Tribal Council, shall, upon receipt of such report, grant a hearing, hear testimony and determine the action to be taken, and if such investigation shall merit removal, it shall be ordered by a majority vote of the Council.  And it is further provided that such removed official shall have the right of appeal to the whole Tribe at an annual or special election.

## ARTICLE VI - POWERS AND DUTIES OF THE TRIBAL COUNCIL

Section 1.        The Tribal Council shall have the power, subject to any limitations imposed by the statutes or the Constitution of the United States, and subject to all express restrictions upon such powers contained in this Constitution and Bylaws:

(a)        To regulate the use and disposition of tribal property to protect and preserve the tribal property, wild life and natural resources of the Lac du Flambeau Band of Lake Superior Chippewa Indians, to cultivate Indian arts, crafts, and culture, to administer charity, to protect the health, security, and general welfare of the Tribe.

(b)        To employ legal counsel for the protection and advancement of the rights of the Lac du Flambeau Band of Lake Superior Chippewa Indians and its members.

*Amendment approved by Secretarial Election on June 11, 2002, approved by the Bureau of Indian Affairs on July 22, 2002, Effective date: July 22, 2002.*

(c)    To negotiate with the Federal, State, and local governments, on behalf of the Lac du Flambeau Band of Lake Superior Chippewa Indians and to advise and consult with the representatives of the Department of the Government of the United States on all matters affecting the affairs of the Tribe.

(d)    To approve or veto any sale, disposition, lease or encumbrance of tribal lands and assets which may be authorized or executed by the Secretary of the Interior or any other agency of the Government, PROVIDED THAT, no tribal lands shall be sold or encumbered nor shall they be leased for a period in excess of twenty-five (25) years, EXCEPT THAT, leases may be renewed for up to twenty-five (25) years.

(e)    To advise with the Secretary of the Interior, with regard to all appropriation estimates, or Federal projects, for the benefit of the Tribe, prior to the submission of such estimates to the Bureau of the Budget and to Congress.

(f)    To manage all economic affairs and enterprises of the Tribe in accordance with the terms of a charter to be issued by the Secretary of the Interior.

(g)    To make assignments of tribal lands to members of the Tribe in conformity with Article VII of this Constitution.

(h)    To appropriate for Tribal use any funds held in trust for the Tribe by the United States of America which are available for appropriation; provided, that if any appropriations for any fiscal year amounting to more than $10,000.00 from Tribal trust funds, such appropriation shall not be effective until approved by popular referendum.

(i)    To promulgate legislation, statutes, codes and ordinances, which provide for taxes, assessments, or license fees, or obtaining special rights or privileges, and the same, PROVIDED, such legislative enactments governing the activity of all persons within the Reservation boundaries have been approved by a popular referendum of the Tribe delegating enforcement of these legislative actions to the Tribal Council. *Amendment adopted by Secretarial Election on June 11, 2002, approved by Bureau of Indian Affairs on July 22, 2002, effective date July 22, 2002.*

(j)    To exclude from the restricted lands of the reservation persons not legally entitled to reside thereon, under ordinances which shall be subject to review by the Secretary of the Interior.

(k)    To enact resolutions or ordinances in accordance with Article II of this Constitution governing adoptions and abandonment of membership, PROVIDED, that such adoption shall require the approval of the Secretary of the Interior for each applicant unless he is a person of Indian descent and related by marriage or descent to a member of the Tribe.

(l)     To promulgate and enforce ordinances which shall be subject to review by the Secretary of the Interior, governing the conduct of members of the Tribe and providing for maintenance of law and order and the administration of justice by the establishment of an Indian court, and defining its powers and duties.

(m)     To promulgate legislation, statutes, codes and ordinances, to purchase land for the Tribe for public purpose under condemnation proceedings delegating such power of condemnation to the Tribal Council; PROVIDED, that each decision to purchase land under condemnation proceedings shall be based on a public purpose and shall be necessary to protect the political integrity, economic security, or health and welfare of the Tribe; and FURTHER PROVIDED, that allotted lands shall not be available for purchase under this section. *Amendment adopted by Secretarial Election on June 11, 2002, approved by Bureau of Indian Affairs on July 22, 2002, effective date July 22, 2002.*

(n)     To promulgate legislation, statutes, codes and ordinances, intended to safeguard and promote peace, safety, morals, and the general welfare of the Tribe by regulating the conduct of trade and the use and disposition of property within the territory of the Lac du Flambeau Band of Lake Superior Chippewa Indians, as defined in Article I - Territory-Jurisdiction, including the conduct, the use, and the creation of a land and title office, and the conveyance of property upon the Reservation, delegating the enforcement of these legislative actions to the Tribal Council. *Amendment adopted by Secretarial Election on June 11, 2002, approved by Bureau of Indian Affairs on July 22, 2002, effective date July 22, 2002.*

(o)     To charter subordinate organizations for economic purposes and to regulate the activities of all cooperative and other associations which may be organized under any charter issued under this Constitution.

(p)     To regulate the inheritance of real and personal property, other than allotted lands, within the Lac du Flambeau Reservation, subject to review by the Secretary of the Interior.

(q)     To regulate the domestic relations of members of the Tribe.

(r)     To recommend and provide for the appointment of guardians for orphans, minor members of the Tribe, and mental incompetents, subject to the approval of the Secretary of the Interior, and to administer tribal and other funds or property which may be transferred or entrusted to the Tribe or Tribal Council for this purpose.

(s)     To appropriate for Tribal use and expend general Tribal funds in accordance with the budget therefore adopted pursuant to Article IX hereof.

(t)     To delegate to subordinate boards or to cooperative associations which are open to all members of the Tribe, any of the foregoing powers, reserving the right to review any action taken by virtue of such delegated power.

(u)     To adopt resolutions or ordinances to effectuate any of the foregoing powers.

(v)     To pledge tribal assets, except tribal lands, as collateral to secure loans but only with the approval of a referendum vote of the members of the Tribe and with the approval of the Secretary of the Interior.

(w)     To adopt resolutions, ordinances and a code, subject to the review of the Secretary of the Interior, providing for the licensing, regulation and control of non-band members coming upon or being within the territory or jurisdiction of the Band, as described in Article I - Territory - Jurisdiction of this Constitution, for the purpose of recreational boating, hunting, fishing, trapping, gathering wild rice or other fruits of the earth.

(x)     To adopt resolutions, ordinances and a code, subject to the approval by a majority vote of the qualified voters of the Band at an election called for by the Tribal Council and also subject to review of the Secretary of the Interior, providing, for the regulation and control of Band members who hunt, fish, trap, or gather wild rice upon or within the territory or jurisdiction of the Band as described in Article I - Territory - Jurisdiction, of this Constitution.

(y)     To authorize the Tribal Council to bring suit in any State or Federal court to enforce any of its enactments.

Section 2.     Any resolution or ordinance, which by the terms of this Constitution, is subject to review by the Secretary of the Interior, shall be presented to the Superintendent of the Reservation, who shall, within ten (10) days thereafter, approve or disapprove the same, and if such ordinance or resolution is approved, it shall thereupon become effective, but the Superintendent shall transmit a copy of the same, bearing his endorsement, to the Secretary of the Interior, who may, within ninety (90) days from the date of enactment, rescind said ordinance or resolution for any cause, by notifying the council of such action: PROVIDED, that if the Superintendent shall refuse to approve any resolution or ordinance submitted to him, within ten (10) days after its enactment, he shall advise the council of his reasons therefore, and the council, if such reasons appear to be insufficient, may refer it to the Secretary of the Interior, who may pass upon same and either approve or disapprove it within (90) days from its enactment.

Section 3.     The Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin may exercise such further powers as may in the future be delegated to it by the Federal Government, either through order of the Secretary of the Interior or by Congress, or by the State Government or by members of the Tribe.

Section 4.     Any rights and powers heretofore vested in the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin but not expressly referred to in this Constitution shall not be abridged by this article, but may be exercised by the members of the Tribe through the adoption of appropriate bylaws and constitutional amendments.

# ARTICLE VII - LAND

Section 1.     Allotted Lands.        Allotted lands, including heirship lands, within the Lac du Flambeau Reservation shall continue to be held as heretofore by their present owners.  It is recognized that under such existing law such lands may be condemned for public purposes, such as roads, public building, or other public improvements, upon payment of adequate compensation, by any agency of the Federal Government, or by the Tribe itself. It is further recognized that under existing law such lands may be inherited by the heirs of the present owner, whether or not they are members of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin.  Likewise, it is recognized that under existing law the Secretary of the Interior may, in his discretion, remove restrictions upon such land, upon application by the Indian owners, whereupon the land will become subject to State taxes and may then be mortgaged or sold.  The right of the individual Indian to hold or to part with his land, as under existing law, shall not be abrogated by anything contained in this Constitution, but the owner of restricted land may, with the approval of the Secretary of the Interior, voluntarily convey his land to the Tribe either in exchange for a money payment or in exchange for an assignment covering the same land or other land, as hereinafter provided.

Section 2.     Tribal Lands. The unallotted lands of the Lac du Flambeau Reservation, and all lands which may hereafter be acquired by the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin or by the United States in trust for the said Tribe shall be held as tribal lands, and no part of such land shall be mortgaged or sold.  Tribal lands shall not be allotted to individual Indians, but may be assigned to members of the Tribe, or leased, or otherwise used by the Tribe, as hereinafter provided.

Section 3.     Leasing of Tribal Lands.        Tribal lands may be leased by the Tribal Council, with the approval of the Secretary of the Interior, for such periods of time as are permitted by law.

In the leasing of tribal lands preference shall be given, first, to cooperative associations of members of the Tribe, and, secondly, to individual Indians who are members of the Tribe.  No lease of tribal lands to a non-member shall be made by the Tribal Council unless it shall appear that no cooperative association of members of the Tribe or individual member of the Tribe is able and willing to use the land and to pay a reasonable fee for such use.

Grazing permits covering tribal lands may be issued by the Tribal Council in conformity with Departmental Regulations for the protection of Indian range and timber resources authorized by Section 6 of the Act of June 18, 1934.

Section 4.     Grant of "Standard" Assignments.        In any assignment of tribal lands which are now owned by the Tribe or which may be acquired hereafter for the Tribe by the United States or purchased by the Tribe out of tribal funds, preference shall be given, first, to heads of families which are entirely landless, and secondly, to heads of families which have no allotted lands, or interests in allotted lands, but shall have already received

assignments consisting of less than an economic unit of agricultural land, or other land or interests in land of equal value, such economic unit to be determined from time to time by the Tribal Council.

No allotted member of the Tribe who may hereafter have the restrictions upon his land removed and whose land may hereafter be alienated, except to the Tribe, shall be entitled to receive an assignment of land as a landless Indian.

The Tribal Council, may, if it sees fit, charge a fee of not to exceed five dollars ($5) on approval of an assignment made under this section.

Assignments made under this section shall be for the primary purpose of establishing homes for landless members and shall be known as "standard" assignments.

Section 5.    Tenure of "Standard" Assignments.   If any member of the Tribe holding a "standard" assignment of land shall, for a period of one year fail to use the land so assigned or shall use such land for any unlawful purpose such assignment may be canceled by the Tribal Council after due notice and an opportunity to be heard, and the said land may be reassigned in accordance with provisions of Section 4 of this Article.

Upon the death of any Indian holding a "standard" assignment, his heirs or other individuals designated by him, by will or written request shall have a preference in the reassignment of the land, provided such persons are members of the Tribe who would be eligible to receive a "standard" assignment.

Section 6.    Grant of "Exchange" Assignments.    Any members of the Tribe who owns an allotment or any share or heirship land may voluntarily convey his interest in such land to the Tribe in exchange for an assignment to the same land or other land of equal value. If the assignee prefers, he may receive, in lieu of a specific tract of land, a proportionate share in a larger unit of land or other interest.

Assignments under this section shall be known as "exchange" assignments.

Section 7.    Inheritance of Improvements.            Improvements of any character made upon assigned land may be bequeathed to and inherited by members of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin or otherwise disposed of under such regulations as the Tribal Council shall provide.  No permanent improvements shall be removed from the land without the consent of the Tribal Council.

Section 8.    Exchange of Assignments.    Assignments may be exchanged between members of the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin by common consent in such a manner as the Tribal Council shall designate.

Section 9.    Purchase of Land by Tribe.    Tribal funds may be used to acquire land under the following circumstances:

(a)     Land within or without the Lac du Flambeau Reservation which is not now in trust or restricted Indian ownership may be purchased by or for the Lac du Flambeau Band of Lake Superior Chippewa Indians, either with funds under control of the Tribal Council, or, if the Secretary of the Interior consents, with other tribal funds.

(b)     Restricted or trust lands, including land in heirship status, may be purchased with funds under the control of the Tribal Council, or; if the Secretary of the Interior consents; with other tribal funds.

Section 10.   Method of Making Assignments.     Applications for assignments shall be filed with the Secretary of the Council, and shall be in writing, setting forth the name of the person or persons applying for the land and as accurate a description of the land desired as the circumstances shall permit.

Notices of all applications received by the Secretary shall be posted by him in the Agency office and in at least three other conspicuous places in the district in which the land is located for not less than twenty (20) days before action is taken by the Council.  Any member of the Tribe wishing to oppose the granting of an assignment shall do so in writing, setting forth his objections to be filed with the Secretary of the Council, and may if he so desires appear before the Council to present evidence.  The Secretary of the Council shall furnish the Superintendent or other officers-in-charge of the Agency a complete record of all actions taken by the council on applications for assignments of land, and a complete record of assignment shall be kept in the Agency office and shall be open for inspection by members of the Tribe.

The Council shall draw up one or more forms for "standard" and "exchange" assignments, which shall be subject to the approval of the Secretary of the Interior.

## ARTICLE VIII - AMENDMENTS

Amendments to this Constitution and Bylaws may be ratified and approved in the same manner as this Constitution and Bylaws.  Whenever the Tribal Council by a vote of eight (8) members shall consider an amendment necessary such amendment shall be sent to the Secretary of the Interior.  It shall then be the duty of the Secretary of the Interior to call an election.  If at such election the amendment is adopted by a majority vote of the adult members of the Tribe, residing on the reservation at least one (1) year prior to the date of the election, voting thereon in an election in which at least thirty (30) percent of those entitled to vote shall vote, such amendment shall be  submitted to the Secretary of the Interior and if approved by him shall thereupon become effective.

## ARTICLE IX - TRIBAL GENERAL FUND BUDGET

Section 1.     For the purposes of this Article, the Tribal General Fund includes all funds received by the Tribe, from income of Tribal enterprises, donations, unrestricted

grants, or other sources which are not held in trust for the Tribe by the United States of America, and which are not restricted as to use.

Section 2.        No later than 90 days prior to the end of the current fiscal year, the Tribal Administrator shall prepare and submit to the Tribal Council a projection of Tribal General Fund revenues for the next year and a proposed budget for expenditures of such funds.  The Tribal Council shall post notice and hold a public informational  session on proposed budget.  The Tribal Council shall then set and hold a public hearing on the proposed budget no later than 60 days prior to the end of the fiscal year.  No later than 45 days prior to the end of the fiscal year the Tribal Council shall adopt a proposed Tribal General Fund budget and conduct a popular referendum on the budget as a whole.

Section 3.        If the Tribal General Fund budget is approved by a vote of a majority of Tribal members voting at the popular referendum, such budget shall govern Tribal General Fund expenditures for the next fiscal year.  If the General Fund budget is disapproved, the Tribal Council shall hold an additional public hearing, adopt a new proposed Tribal General Fund budget, and conduct a popular referendum on such budget.  If this revised budget is disapproved, the Tribal Council may, in its discretion, present further proposed budgets for referendum or follow the Tribal General Fund budget for the preceding year.  Until a Tribal General Fund budget is approved by referendum, expenditure of the Tribal General Fund shall be made in accordance with the approved budget for the preceding year.  Such approved budget shall not be increased beyond fifteen percent (15%).

Section 4.        The Tribal Council shall appropriate and expend the Tribal General Fund in accordance with the budget approved by referendum.  The Tribal Council may, by resolution, increase or decrease expenditures provided that no such change shall exceed fifteen percentum (15%) of each approved budget line item involved in the change.  Any budget modification which results in a change of any budget line item in excess of fifteen percentum (15%) shall not be effective until approved by popular referendum.

## ARTICLE X - JUDICIARY

Section 1.        Composition.  There shall be a Tribal Trial Court and an Appeals Court of the Lac du Flambeau Band of Lake Superior Ojibwe Indians and such other court of special jurisdiction and other forums of special jurisdiction for traditional dispute resolution as deemed necessary and appointed by the Tribal Council.

(a)        The Tribal Trial Court shall consist of one Chief Trial Judge and such number of Associate Trial Judges as the Tribal council shall deem necessary and appropriate.

(b)        The Appeals Court shall consist of a panel of three judges.

Section 2.        Judicial Powers.  The judicial power of the Lac du Flambeau Band of Lake Superior Ojibwe Indians shall be vested in the Judiciary.  The Judiciary shall have the

powers to interpret and apply the Constitution and laws of the Lac du Flambeau Band of Lake Superior Ojibwe Indians.

Section 3.        Jurisdiction.  The Tribal Trial Court shall have the original jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs, and traditions of the Lac du Flambeau Band of Lake Superior Ojibwe, including all actions in which the provisions of the Indian Child Welfare Act of 1978 , 25 U.S.C., sec. 1901, et.seq., are applicable and cases in which the Tribe, or its officials and employees shall be a party.  This grant of jurisdiction shall not be construed as a waiver of the Tribe's sovereign immunity.

Section 4.        Powers of the Courts.

(a)        The Tribal Trial Court shall have the power to make findings of fact and conclusions of law.  The Trial Court shall have the power to issue all remedies in law and in equity including injunctive and declarative relief and all writs including attachment and mandamus.

(b)        The Tribal Trial Court shall have the power to declare the laws of the Lac du Flambeau Band of Lake Superior Ojibwe Indians void if such laws are not consistent with the Tribe's Constitution.

(c)        The Appeals Court shall hear appeals allowed by the Tribal Court Code, Chapter 80.   The jurisdiction shall be limited to a review of final order, sentences, and judgment of the trial court.

Section 5.        Qualifications.  No person shall be eligible for selection as a judge unless he or she:

(a)        is at least 30 years of age;

(b)        is of good moral character and integrity;

(c)        has never been convicted of an offense termed a felony by the laws of the Lac du Flambeau Band of Lake Superior Ojibwe Indians, the State of Wisconsin, an Indian Tribe, or the United States;

(d)        has not been convicted of any other crime involving dishonesty or moral turpitude;

(e)        is capable of preparing papers and conducting hearings incident to the offices of the Judge;

(f)        has demonstrated knowledge of the Lac du Flambeau Tribal Code and Ordinances and an understanding of the federal and state laws.

Section 6.    Term.  Each judge shall hold office for a period of three (3) years unless sooner removed for cause, as defined in the Judicial Code of Ethics and/or Chapter 80, or by reason of resignation, death, or incapacitation.  Judges shall be eligible for reappointment, subject to the eligibility requirements pursuant to Section 5 herein.

Section 7.    Appointment of Judges.

(a)    The Tribal Council shall select, by majority vote, Tribal Trial Court and Appeals Court Judges from eligible candidates, as defined in Section 5 herein and in Chapter 80, at Tribal Council meetings in which a quorum is present.

(b)    Each judge selected by a majority vote shall then be appointed by the Tribal Council to a term of service.

Section 8.    Disqualification and Removal of Judges.

(a)    Disqualifications.

  (1)    A Trial judge shall be disqualified to sit on any case in which he or she has any direct interest, is or has been a pre-trial witness, or is so related to a party as to render it improper for him or her to preside at the trial proceedings.  Upon disqualification, an alternate trial judge shall sit on the case.

  (2)    An appellant judge shall be disqualified to hear the appeal in any case in which he or she has any direct interest, or has been a witness at trial, or is so related to a party as to render it improper for him or her to hear the appeal.  Upon disqualification, the position of the appellate judge will be filed for the purpose of hearing the particular case by the other judges of the Court of Appeals.

(b)    Suspension and Removal.

  (1)    A judge may be suspended from office upon written charges brought for his or her removal which recite good cause as defined by the Judicial Code of Ethics and/or Chapter 80.  A hearing shall be held before the Lac du Flambeau Judicial Committee within ten (10) working days of the judge's receipt of written notice of the charges, at which time the judge shall be provided with the opportunity to respond to the charges against him or her, including the presentation of the testimony of witnesses in his or her behalf.  A judge may be removed only for good cause shown at the hearing, and;

(a)      a vote taken by secret ballot of a two-thirds (2/3) majority of the Judicial Committee recommending removal, at which at least four (4) members are present, and;

(b)      a vote taken by secret ballot of a two-thirds (2/3) majority of the Tribal Council at a meeting held for that purpose at which at least eight (8) members are present.

(2)      Upon resignation, death, removal, or physical or mental incapacitation of a judge, the Lac du Flambeau Judicial Committee shall recommend a replacement to the Tribal Council. The Tribal Council shall vote by majority on such individual who shall serve the remainder of that term.

*Amendment adopted by Secretarial Election on July 26, 2005, approved by Bureau of Indian Affairs on September 9, 2005, effective date September 9, 2005.*

## BYLAWS OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS OF WISCONSIN

## ARTICLE I - DUTIES OF OFFICERS

Section 1.      The President of the Tribal Council shall preside at all meetings of the Council. He shall at all times have general supervision of the affairs of the Tribal Council and such matters as naturally pertain to the general welfare of the community. It shall also be the duty of the President to countersign all checks drawn against funds of the Tribe by the Treasurer. He shall vote only in case of a tie. The President shall be ex-officio member of all subordinate boards and committees.

Section 2.      In the absence of the President, the Vice-President shall preside at all meetings of the Tribal Council and shall act in his stead in all matters pertaining to the office of the President.

Section 3.      The Secretary shall keep an accurate record of all proceedings of the Tribal Council and furnish copies thereof to the Superintendent of the jurisdiction. He shall attend to the keeping of the official records of the Tribal Council and shall be responsible for the prompt and efficient handling of all correspondence pertaining to the business of the Tribal Council. All official records of the Tribal Secretary shall be open to inspection by the members of the Tribe at all times. The Secretary shall be ex-officio member of all subordinate boards and committees.

Section 4.      The Treasurer shall be the custodian of all funds in possession of the Tribe from any source. He shall be bonded by a surety company of recognized standing in an amount to be determined by the Tribal Council, such surety company and bond to be approved by the Commissioner of Indian Affairs. He shall keep an accurate record of all

such funds and shall disburse the same in accordance with the vote of the Tribal Council and as designated by this Constitution and Bylaws. The books shall be open to audit and examination by the duly authorized officers of the Secretary of the Interior at all times.

The records of the Treasurer shall be open to inspection by members of the Tribe, members of the Tribal Council and its officers.

Section 5.        The subordinate officers, boards, and committees of the Tribal Council shall perform such duties as the Tribal Council shall, by resolution, from time to time provide.

## ARTICLE II - OATH

All officers when elected shall be duly installed and subscribe to an oath of office to support the Constitution of the United States and this Constitution. Such officers may be sworn in by any officer qualified to administer an oath.

## ARTICLE III - MEETINGS

Section 1.        Regular meetings of the Tribal Council shall be held on the first Friday of January, April, July and October, and at such other times as the Council shall designate. Special meetings shall be held at the discretion of the president, or upon request of three (3) members of the Tribal Council. Five (5) days written notice shall be given to all Council members.

Section 2.        Seven (7) members shall constitute a quorum.

Section 3.        The Tribal Council shall prescribe such rules of order for its meetings as it desires.

Section 4.        The meetings of the Tribal Council except executive sessions shall be public to the Tribe.

## ARTICLE IV - ADOPTION OF CONSTITUTION AND BYLAWS

This Constitution and Bylaws, when ratified by a majority of vote of the adult members of the Lac Du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin voting at a special election called for the purpose by the Secretary of the Interior, PROVIDED, that at least thirty (30) percent of those entitled to vote shall vote in such election, shall be submitted to the Secretary of the Interior, and, if approved, shall be effective from the date of approval.

Includes Amendments:

I - Approved June 25, 1943
II - Approved June 2, 1945
III - Approved June 25, 1943
IV - Approved June 21, 1953
V - Approved June 19, 1959
VI - Approved November 13, 1961
VII, VIII, IX, X, XI - Approved August 19, 1974
XII, XIII, XIV - Approved September 10, 1982
XV - Approved June 22, 1983
XVI - Approved November 5, 1985
XVII - Approved November 5, 1985
XVIII - Approved February 28, 1995
XIX - Approved July 22, 2002
XX - Approved July 22, 2002
XXI - Approved July 22, 2002
XXII - Approved July 22, 2002
XXIII - Approved September 9, 2005

AMENDMENT XIX
CONSTITUTION AND BY LAWS
OF THE
LAC DU FLAMBEAU BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
OF WISCONSIN

ARTICLE VI - POWERS AND DUTIES OF THE TRIBAL COUNCIL, Subsection 1(b) shall be amended to remove Secretary of Interior approval of attorney contracts and the fixing of fees.  Subsection 1(b) shall be amended to read as follows:

(b)      To employ legal counsel for the protection and advancement of the rights of the Lac du Flambeau Band of Lake Superior Chippewa Indians and its members.

Adopted by Secretarial election:      June 11, 2002

Approved:      July 22, 2002

Effective date:      July 22, 2002

AMENDMENT XX
CONSTITUTION AND BY LAWS
OF THE
LAC DU FLAMBEAU BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
OF WISCONSIN

ARTICLE VI - POWERS AND DUTIES OF THE TRIBAL COUNCIL, Subsection 1(i) shall be amended to remove Secretary of Interior review of ordinances directly relating to non-members of the Tribe and to grant the approval of such ordinances to the Tribe by popular referendum.  Subsection 1(i) shall be amended to read as follows:

(i)      To promulgate legislation, statutes, codes and ordinances, which provide for taxes, assessments, or license fees, or obtaining special rights or privileges, and the same, PROVIDED, such legislative enactments governing the activity of all persons within the Reservation boundaries have been approved by a popular referendum of the Tribe delegating enforcement of these legislative actions to the Tribal Council.

Adopted by Secretarial election:      June 11, 2002
Approved:      July 22, 2002
Effective date:      July 22, 2002

AMENDMENT XXI
CONSTITUTION AND BY LAWS
OF THE
LAC DU FLAMBEAU BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
OF WISCONSIN

ARTICLE VI - POWERS AND DUTIES OF THE TRIBAL COUNCIL, Subsection 1(m) shall be amended to authorize the promulgation of legislation, statutes, codes and ordinances allowing for the purchase of land through condemnation proceedings, and delegating the power of condemnation to the Tribal Council. Subsection 1(m) shall be amended to read as follows:

        (m)     To promulgate legislation, statutes, codes and ordinances, to purchase land for the Tribe for public purpose under condemnation proceedings delegating such power of condemnation to the Tribal Council; PROVIDED, that each decision to purchase land under condemnation proceedings shall be based on a public purpose and shall be necessary to protect the political integrity, economic security, or health and welfare of the Tribe; and FURTHER PROVIDED, that allotted lands shall not be available for purchase under this section.

Adopted by Secretarial election:        June 11, 2002

Approved:        July 22, 2002

Effective date:        July 22, 2002

AMENDMENT XXII
CONSTITUTION AND BY LAWS
OF THE
LAC DU FLAMBEAU BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
OF WISCONSIN

ARTICLE VI - POWERS AND DUTIES OF THE TRIBAL COUNCIL, Subsection 1(n) shall be amended to remove Secretary of Interior review of ordinances directly relating to non-members of the Tribe intending to regulate the conduct of trade and the use and disposition of property within the territory of the Tribe.  Subsection 1(n) shall be amended to read as follows:

(n)     To promulgate legislation, statutes, codes and ordinances, intended to safeguard and promote peace, safety, morals, and the general welfare of the Tribe by regulating the conduct of trade and the use and disposition of property within the territory of the Lac du Flambeau Band of Lake Superior Chippewa Indians, as defined in Article I - Territory-Jurisdiction, including the conduct, the use, and the creation of a land and title office, and the conveyance of property upon the Reservation, delegating the enforcement of these legislative actions to the Tribal Council.

Adopted by Secretarial election:     June 11, 2002
Approved:     July 22, 2002
Effective date:     July 22, 2002

AMENDMENT XXIII
CONSTITUTION AND BY LAWS
OF THE
LAC DU FLAMBEAU BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
OF WISCONSIN

ARTICLE X -JUDICIARY SHALL BE ADDED TO PROVIDE FOR A TWO TIERED JUDICIARY SYSTEM CONSISTING OF A TRIBAL TRIAL COURT AND AN APPEALS COURT AND SHALL READ AS FOLLOWS:

Section 1.     Composition.

There shall be a Tribal Trial Court and an Appeals Court of the Lac du Flambeau Band of Lake Superior Ojibwe Indians and such other court of special jurisdiction and other forums of special jurisdiction for traditional dispute resolution as deemed necessary and appointed by the Tribal Council.

(a)     The Tribal Trial Court shall consist of one Chief Trial Judge and such number of Associate Trial Judges as the Tribal council shall deem necessary and appropriate.

(b)     The Appeals Court shall consist of a panel of three judges.

Section 2.     Judicial Powers.

The judicial power of the Lac du Flambeau Band of Lake Superior Ojibwe Indians shall be vested in the Judiciary.  The Judiciary shall have the powers to interpret and apply the Constitution and laws of the Lac du Flambeau Band of Lake Superior Ojibwe Indians.

Section 3.     Jurisdiction.

The Tribal Trial Court shall have the original jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs, and traditions of the Lac du Flambeau Band of Lake Superior Ojibwe, including all actions in which the provisions of the Indian Child Welfare Act of 1978 , 25 U.S.C., sec. 1901, et.seq., are applicable and cases in which the Tribe, or its officials and employees shall be a party.  This grant of jurisdiction shall not be construed as a waiver of the Tribe's sovereign immunity.

Section 4.     Powers of the Courts.

(a)     The Tribal Trial Court shall have the power to make findings of fact and conclusions of law.  The Trial Court shall have the power to issue all remedies in law and in equity including injunctive and declarative relief and all writs including attachment and mandamus.

(b)     The Tribal Trial Court shall have the power to declare the laws of the Lac du Flambeau Band of Lake Superior Ojibwe Indians void if such laws are not consistent with the Tribe's Constitution.

(c)     The Appeals Court shall hear appeals allowed by the Tribal Court Code, Chapter 80.   The jurisdiction shall be limited to a review of final order, sentences, and judgment of the trial court.

Section 5.     Qualifications.

No person shall be eligible for selection as a judge unless he or she:

(a)     is at least 30 years of age;

(b)     is of good moral character and integrity;

(c)     has never been convicted of an offense termed a felony by the laws of the Lac du Flambeau Band of Lake Superior Ojibwe Indians, the State of Wisconsin, an Indian Tribe, or the United States;

(d)     has not been convicted of any other crime involving dishonesty or moral turpitude;

(e)     is capable of preparing papers and conducting hearings incident to the offices of the Judge;

(f)     has demonstrated knowledge of the Lac du Flambeau Tribal Code and Ordinances and an understanding of the federal and state laws.

Section 6.     Term.

Each judge shall hold office for a period of three (3) years unless sooner removed for cause, as defined in the Judicial Code of Ethics and/or Chapter 80, or by reason of resignation, death, or incapacitation.  Judges shall be eligible for reappointment, subject to the eligibility requirements pursuant to Section 5 herein.

Section 7.     Appointment of Judges.

(a)     The Tribal Council shall select, by majority vote, Tribal Trial Court and Appeals Court Judges from eligible candidates, as defined in Section 5 herein and in Chapter 80, at Tribal Council meetings in which a quorum is present.

(b)     Each judge selected by a majority vote shall then be appointed by the Tribal Council to a term of service.

Section 8.      <u>Disqualification and Removal of Judges</u>.

(a)     Disqualifications.

    (1)     A Trial judge shall be disqualified to sit on any case in which he or she has any direct interest, is or has been a pre-trial witness, or is so related to a party as to render it improper for him or her to preside at the trial proceedings. Upon disqualification, an alternate trial judge shall sit on the case.

    (2)     An appellant judge shall be disqualified to hear the appeal in any case in which he or she has any direct interest, or has been a witness at trial, or is so related to a party as to render it improper for him or her to hear the appeal.  Upon disqualification, the position of the appellate judge will be filed for the purpose of hearing the particular case by the other judges of the Court of Appeals.

(b)     Suspension and Removal.

    (1)     A judge may be suspended from office upon written charges brought for his or her removal which recite good cause as defined by the Judicial Code of Ethics and/or Chapter 80.  A hearing shall be held before the Lac du Flambeau Judicial Committee within ten (10) working days of the judge's receipt of written notice of the charges, at which time the judge shall be provided with the opportunity to respond to the charges against him or her, including the presentation of the testimony of witnesses in his or her behalf.  A judge may be removed only for good cause shown at the hearing, and;

        (a)     a vote taken by secret ballot of a two-thirds (2/3) majority of the Judicial Committee recommending removal, at which at least four (4) members are present, and;

        (b)     a vote taken by secret ballot of a two-thirds (2/3) majority of the Tribal Council at a meeting held for that purpose at which at least eight (8) members are present.

    (2)     Upon resignation, death, removal, or physical or mental incapacitation of a judge, the Lac du Flambeau Judicial Committee shall recommend a replacement to the Tribal Council.  The Tribal Council shall vote by majority on such individual who shall serve the remainder of that term.

Adopted by Secretarial election:      July 26, 2005
Approved:      September 9, 2005
Effective date:      September 9, 2005

**Exhibit 3**

TRIBAL CODE

CHAPTER 44a

TRIBALLY-OWNED BUSINESS ORGANIZATION CODE

Subchapter 1 - General

44a.101 Short Title.

(1)     This Title shall be known as the Lac du Flambeau Band of Lake Superior Chippewa Indians of Wisconsin ("LDF" or "Tribe") Tribally-Owned Business Organization Code ("Code").

44a.102 Authority, Purpose and Scope.

(1)     Authority. The Tribal Council, the governing body of the Tribe, being possessed of the inherent sovereign powers of self-government pursuant to Articles III, VI, VII of the LDF Constitution and Article I of the LDF Bylaws, is empowered to exercise its authority pursuant to the Constitution to enact this Code governing the creation, form, and administration and oversight of corporations, limited liability companies and other business entities that are Tribally-owned.  For purposes of this Code, Tribally-owned requires majority ownership by the Tribe or a subdivision thereof.

(2)     Purpose. The purpose of this Code is to provide for economic development of the  Tribe by:

(a)     Providing the legal framework for organizing Tribally-owned corporations, limited liability companies and other business entities in which the Tribe has a majority ownership interest.

(b)     Authorizing the formation of Tribally-owned corporations, limited liability companies and other Business Organizations to manage  LDF's  economic development and other business activities separate and independent from the affairs of the Tribe, with the ability of the aforementioned Business Organizations  to enter into legally-binding contracts and commercial relationships for the purpose under which they are created pursuant to the requirements and limitations of this Code, and the Business Organizations' formation and creation documents..

(3)     Scope.

(a)     This Code shall apply to Tribally-owned corporations, limited liability companies and other Business Organizations in which the  Tribe, or a subdivision thereof, has a majority ownership interest and  was organized pursuant to this Code.

(b)   Private businesses are excluded from organizing under this Code, including those owned by enrolled Tribal members, members of other tribes or non-natives.

**44a.103** Sovereign Immunity.

(1)   Adoption of this Code does not waive the Tribe's sovereign immunity or effectuate a consent to suit in any federal, tribal or state court; and neither the adoption of this Code, nor incorporation of any corporation, limited liability company or other Business Organization herein shall be construed to be a waiver of the Tribe or a consent to suit against the Tribe in any Federal, Tribal or State court.

(2)   Business Organizations formed under this Code may be granted the ability to waive the sovereign immunity of the business entity in accordance with its formation documents. Any waiver of the sovereign immunity of a Tribally-owned Business Organization must be:

    (a)   Explicit and in writing; and

    (b)   Approved by written resolution of the governing board or officers of the Business Organization as required by its Formation Documents; and

    (c)   Limited in scope and duration to the fullest extent allowable; provided however, no Tribally-owned Business Organization shall be granted the authority to waive the sovereign immunity of the Tribe without formal consent and written resolution of the Tribe authorizing such a waiver.

**44a.104** Privileges and Immunities.

(1)   All Tribally-owned Business Organizations established under this Code shall be considered governmental agencies and instrumentalities of the Tribe; and their officers and employees considered officers and employees of the Tribe, created to carry out authorities and responsibilities of the Tribe for economic development for the Tribe on behalf of the Tribal Membership.

(2)   All officers and employees of any Tribally-owned Business Organization established under this Code are entitled to the privileges and immunities enjoyed by the Tribe, including but not limited to immunities from suit in Federal, Tribal and State courts and from Federal, State and local taxation and regulation.

**44a.105** Powers.

(1)   All Tribally-owned corporations, limited liability companies or other Business Organizations organized and existing under this Code may:

(a)     Sue and be sued, complaint and defend, in its name subject to the limitations contained in Section 44a.103;

(b)     Purchase, take, receive, lease, or otherwise acquire, own, hold, improve, use and otherwise deal in and with real or personal property, or an interest in it, wherever situated;

(c)     Sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of all or any part of its property and assets;

(d)     Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge or otherwise dispose of, and otherwise use and deal in and with shares or other interests in or obligations of other companies, domestic or foreign corporations, associations, general or limited partnerships or individuals, or direct or indirect obligations of the United States or of any government, tribe, state, territory, governmental district or municipality or of any instrumentality of it;

(e)     Make contracts and guarantees and incur liabilities, borrow money at such rates of interest as the entity may determine, issue its notes, bonds and other obligations and  secure any of its obligations by mortgage or pledge of all or any part of its property, franchises and income;

(f)     Lend money for its proper purposes, invest and reinvest its funds and take and hold real property and personal property for the payment of funds so loaned or invested;

(g)     Conduct its business, carry on its operations and have and exercise the powers granted by this Code in any Indian reservations, state, territory, district or possession of the United States, or in any foreign country;

(h)     Elect or appoint managers, officers, employees and agents of the entity, and define their duties and authority, which may include authority also delegated to the board, members or managers under this Code, and fix their compensation;

(i)     Make and alter operating agreements, not inconsistent with articles of incorporation or  organization or other formation documents or with the laws of the Tribe, for the administration and regulation of the affairs of the entity;

(j)     Indemnify a current or former director, member or manager of the entity against expenses actually and reasonably incurred by him/her or it  in connection with the defense of an action, suit or proceeding, civil or criminal, in which he/she or it is made a party by reason of being or having been such director, member or manager, except in  relation to matters as to which he/she or it shall be adjudged in the action, suit or proceeding to be liable to the entity

for negligence or misconduct in the performance of a duty or to have received improper personal benefit on account thereof; and to make any other indemnification that is authorized by the articles of incorporation, organization or other Formation Documents or resolution adopted by the board of director or members after notice as described within its formation documents;

(k) Cease its activities and surrender its certificate of organization or certificate of incorporation;

(l) Have and exercise all powers necessary or convenient to effect any or all of the purposes for which the entity is organized;

(m) Become a member of a general partnership, limited liability company, partnership or similar association, or any entity;

(n) Pay pensions and establish pension plans, pension trusts, profit-sharing plans, ownership interest bonus plans and option plans, and benefit or incentive plans for any or all of its current or former managers, officers, employees and agents;

(o) Make donations for the public welfare or for charitable or scientific or educational purposes.

(p) Sell, convey, mortgage assets of the Business Organization pursuant to the powers granted in the Business Organizations' formation documents.

**44a.106 Definitions.**

As used in this Code:

(1) "Agreement" means a contract reduced to writing providing the terms by which the parties thereto and there subject therein is bound.

(2) "Articles of Incorporation" means the articles filed to create a corporation under this Code and any amendments thereto.

(3) "Article of Organization" means the articles filed to create a limited-liability company and any amendments thereto.

(4) "Bylaws" means the rules or administrative provisions adopted by a corporation for its internal governance.

(5) "Board of Directors" means the person(s) or entity(ies) designated to manage the corporation or other business entity pursuant to the Articles of Incorporation and Bylaws.

(6) "Business Organization" means any corporation, limited liability company or other business entity created under this Code.

(7) "Business Purpose" means any lawful purpose of a corporation, limited liability company or other business entity that generates income or other valuable benefit, whether pecuniary or otherwise.

(8) "Corporation" means an organization formed under this Code that is a tribally chartered business with limited liability for the owners, transferability of ownership interests, centralized management by a board of directors, perpetual existence until dissolved, and whose legal existence is separate from its owners and shareholders.  For purposes of this Code, "Corporation" may also include S-corporations or C-corporations.

(9) "Court" includes every federal, Tribal and state Court and there judges therein.

(10) "Distribution" means a direct or indirect transfer by a limited liability company of money or other property to or for the benefit of its owners in respect of their interests.

(11) "Domestic" refers to any Business Organization formed under this Code or the general LDF Business Corporation Code at Chapter 44.

(12) "Entity" includes an individual, a general partnership, limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal or commercial entity formed under this Code or Subchapters herein.

(13) "Foreign" refers to the corporations, limited liability companies and other business entities formed and organized under the laws of a jurisdiction other than the Tribe.

(14) "Formation Documents" means those documents necessary for the creation of a Business Organization approved by the Tribal Council and filed with the Tribal Secretary as provided by this Code.

(15) "Indian-owned" means a corporation, limited liability company or other business entity of which the majority shareholders, members or other owners are citizens of a federally-recognized Indian tribe.

(16) "Interest" means an owners right in any corporation, limited liability company or other business entity, including rights in distributions, profits and losses, and to participate in management as specified in the Bylaws, operating agreements or other documents.

(17) "Limited Liability Company" or "LLC" means tribally organized business with limited liability for the owners, transferability of ownership interests, centralized management by managers, perpetual existence until dissolved, and whose legal existence is separate from its owners and members.

(18) "Majority Interest" means an owner or owners holding more than fifty percent (50%) of total voting and ownership interest in the corporation, limited liability company or other business entity.

(19) "Manager" means the person(s) or entity(ies) designated to manage the LLC or other business entity pursuant to Articles of Organization and an Operating Agreement.

(20) "Member" means the owner of the limited liability corporation.

(21) "Operating Agreement" means the document governing the management of a Limited Liability Company organized pursuant to this Code.

(22) "Owners" means the person(s) or entity(ies) having an interest in the shares, profits and losses, and voting rights in a Business Organization.

(23) "Person" includes a natural person, Tribal entity and any business or other organization such as a general partnership, limited partnership, a domestic or foreign corporation or company, limited liability or otherwise, a trust, an estate, or an association.

(24) "Reservation" means all lands under the jurisdiction of the Tribe, including all lands within the boundaries of the Tribe's Reservation, all land held in fee by the Tribe, all lands held in trust by the United States for the benefit of the Tribe, and all lands and territory ceded by the Tribe to the United States pursuant to any treaty, agreement or settlement.

(25) "Shareholders" means those individuals or entities who own an interest in a corporation formed pursuant to this Code as dictated by the corporation's articles of incorporation filed with the Tribal Secretary as provided in this Code. If the corporation is wholly owned by the Tribe, then the Tribe is the sole shareholder.

(26) "State" includes a state, territory, or possession of the United States and the District of Columbia.

(27) "Tribal Bylaws" means the rules or administrative provisions adopted by the Tribe for its internal governance of the Tribal Council adopted and amended by the Tribal members on September 9, 2005.

(28) "Tribal Constitution" or "Constitution" means the Constitution of the Lac Du Flambeau Band of Lake Superior Chippewa Indians as adopted and amended by the Secretarial Election on July 26, 2005, and approved by the Bureau of Indian Affairs on September 9, 2005 and effective on September 9, 2005.

(29) "Tribal Land" means all lands within the LDF Reservation and all lands held in trust by the United States government for the benefit of the Tribe or individual members of the Tribe over which the Tribe exercises jurisdiction or fee land owned by the Tribe.

      (2)      File the original in his/her office;

      (3)      Return the copy to the Tribally-owned Business Organization.

(2)    All records filed pursuant this Code shall be available for inspection pursuant to applicable Tribal law.

**44a.202 Issuance and Effect of Certification.**

(1)    Upon receipt of the duly authorized Formation Documents of the Tribally-owned Business Organization the Tribal Secretary shall issue a certificate of organization certifying that that Tribally-owned Business Organization is duly created and is in good standing under Tribal law.

(2)    Upon the issuance of a certificate of organization to a Tribally-owned Business Organization, it shall be considered organized and such certificate of organization shall be conclusive evidence that all conditions precedent required to be performed by the incorporators or organizers have been complied with and that the corporation has been legally organized under this Code.

(3)    A Tribally-owned Business Organization shall not transact business or incur indebtedness, except that which is incidental to its organization or to obtaining subscriptions for or payment of contributions, until the LDF Secretary has issued a certificate of organization.

**44a.203 Registered Office and Registered Agent.**

(1)    Each Tribally-owned Business Organization shall have and continuously maintain on the Reservation:

      (a)     A registered office which may be, but need not be, the same as its place of business;

      (b)     A registered agent, which agent may be either an individual resident in this state whose business office is identical with such registered office.

**44a.204 Change of Registered Office or Registered Agent.**

(1)    A Tribally-owned Business Organization may change its registered office or agent, or both, upon filing with the LDF Secretary a statement setting forth:

      (a)     The name of the corporation, limited liability company or other business entity;

      (b)     The address of its then registered office;

      (c)     If the address of its registered office is changed, the address to which the new registered office is to be changed;

(d)      The name of its then registered agent;

(e)      If the registered agent is changed; the name of the new successor registered agent;

(f)      That the address of its registered office and the address of the registered agent will be identical;

(g)      That the change was authorized by an affirmative majority vote of the board, members or partners of the corporation, limited liability company or business entity.

(2)      The statement shall be signed and delivered to the LDF Secretary. If the LDF Secretary finds the statement conforms to the provisions of this Code, he/she shall file the statement in his/her office, and upon filing the change of address of the registered office or the appointment of the new registered agent or both, the change shall be effective.

### 44a.205 Service of Process.

(1)      The appointed registered agent of the Tribally-owned Business Organization shall be the individual to serve with any process, notice or demand required or permitted by law.

(2)      In the event the registered agent of the Tribally-owned Business Organization cannot without reasonable diligence be found at the registered office, then the LDF Secretary shall be an agent for the business entity. In the event notice or demand is served on the LDF Secretary by default, the process server is required to immediately cause one (1) copy of the notice or demand that was served upon the default LDF Secretary to be forwarded by registered mail, return receipt requested, to the principal office of the corporation, limited liability company or other business entity as defined and prescribed by the LDF Secretary; proof of service to the principal office of the corporation, limited liability company or other business entity shall be returned to the LDF Secretary not less than thirty (30) days after the LDF Secretary signs as the default registered agent.

### 44a.206 Dissolution.

(1)      A Tribally-owned Business Organization organized under this Code shall be dissolved upon the occurrence of any of the following events:

(a)      The period fixed for the duration of the entity has expired;

(b)      By unanimous vote of all the directors, members or partners and reduced to writing;

(c)      Upon the death, retirement, resignation, expulsion, bankruptcy, dissolution of a director, member or partner or occurrence of any event which terminates the

corporation, limited liability company or other business entity, unless the business of the entity is continued by consent of the remaining directors, members or partners or pursuant to a right to do so stated in the articles of incorporation, organizing or other organizing document or operating agreement of the entity.

(2)     At the earliest practicable date following the occurrence of any event prompting dissolution, the Tribally-owned Business Organization shall execute a statement of intent to dissolve with the LDF Secretary.

**44a.207** Filing Statement of Intent to Dissolve.

(1)     One (1) original and one (1) copy of the statement of intent to dissolve shall be delivered to the LDF Secretary. If the LDF Secretary finds that such statement conforms to this Code, he/she shall:

(a)     Endorse on each original and copy the word "filed" and the month, day and year of the filing;

(b)     File the original in his/her office;

(c)     Return the copy to the Tribally-owned corporation, limited liability company or other business entity.

**44a.208** Effect of Filing Intent to Dissolve.

Upon filing by the LDF Secretary of the statement of intent to dissolve the Tribally-owned Business Organization, the entity shall cease to carry on business except for matters to wind-up the business, but its separate existence shall continue until a certificate of dissolution has been issued by the LDF Secretary.

**44a.209** Distribution of Assets Upon Dissolution.

(1)     To settle accounts after dissolution, the liabilities of the Tribally owned Business Organization shall be paid in the following order:

(a)     To creditors, in the order of priority as provided by this Code , except to those directors, members or partners of the entity on account of their contributions;

(b)     To Shareholders, members or partners of the entity in respect of their share of the profits and other compensation by way of income on their contributions; and

(c)     To Shareholders, members or partners of the entity in respect of their contributions to capital.

(2)    Subject to any statement in the Formation Documents, regarding claims of the Shareholders, members or partners share in the Tribally-owned corporation, limited liability company or other business entity assets in respect to the claims for capital and in respect to the claims for profits or for compensation by way of income on the contributions, respectively, in proportion to the respective amounts of the claims.

**44a.210** Articles of Dissolution.

(1)    When all debts, liabilities and obligations of the Tribally-owned Business Organization have been paid and discharged or adequate provision has been made and all the remaining property and assets have been distributed to the shareholders, members or partners, articles of dissolution shall be delivered to the LDF Secretary. The statement shall provide:

(a)    The name of the corporation, limited liability company or other business entity;

(b)    That the LDF Secretary has received and filed a statement of intent to dissolve the Tribally owned corporation, limited liability company or other business entity and the date the statement was filed;

(c)    That all debts, obligations and liabilities have been pad and discharged or that adequate provisions has been made thereto, and proof of the same, if applicable;

(d)    That all remaining property and assets have been distributed to its shareholders, members or partners in accordance with their respective rights and interests, and proof of the same, if applicable;

(e)    That there are no suits pending against the Tribally-owned corporation, limited liability company or business entity in any court or that adequate provisions have been made for the satisfaction of any judgment, order or decree which may be entered against it in any pending suit.

**44a.211** Filing Articles of Dissolution.

(1)    One (1) original and one (1) copy of the articles of dissolution shall be delivered to the LDF Secretary. If the LDF Secretary finds that such articles of dissolution conform to this Code, he/she shall:

(a)    Endorse each original and copy with the word "FILED" and the month, day and year of the filing;

(b)    File the original in his/her office;

(c)    Issue a certificate of dissolution which he/she shall affix to the copy.

(2)  The LDF Secretary shall deliver the certificate of dissolution and the copy to the Tribally-owned corporation, limited liability company or other business entity. Upon the issuance of the certificate of dissolution, the existence of the entity shall cease, except for the purpose of suits, other proceedings and appropriate actions as provided in this Code. The officers, managers or other individuals in the office at the time of dissolution, or their successors, shall thereafter be trustees for the shareholders, members or partners and creditors for the dissolved company and shall have authority to distribute any company property discovered after dissolutions, convey real estate and take such other action as may be necessary on behalf of and in the name of such dissolved Tribally-owned corporation, limited liability company or other business entity.

### Subchapter 3 – Tribally-Owned Corporations

**44a.301** Organization.

(1)  Tribally-owned Corporations established under this Code and Subchapter shall be managed by a Board of Directors.

(2)  The Tribal Council shall by resolution appoint the initial Board of Directors of all Tribally-owned Corporations crated pursuant to this Code. The election or appointment of corporate officers and the election of subsequent directors shall be governed by the Formation Documents.

(3)  Bylaws for the Tribally-owned Corporation shall be drafted by the Board of Directors and approved by the Board of Directors and the Tribal Council and contain provisions:

   (a)  For the Board of Directors: the Board officers, compensation, voting action of the Board, quorum, regular and special meetings, manner of meetings, appointments, contracts, loans, deposits and any other items relevant to the Board of Directors.

   (b)  For the Corporate Officers:  the corporate officers, compensation, terms of office, removal of offices, duties for the President, Vice-President, Secretary, Treasurer and other officers, and vacancies.

**44a.302** Name.

(1)  The corporate name shall include words "Incorporated" or "Inc.," "Corporation" or "Corp.", or "Limited" or "Ltd."  in the name of every Tribally-owned corporation formed under this Code and Subchapter and, in addition, the corporate name may not:

   (a)  Contain a word or phrase which indicates or implies that it is organized  for a purpose other than the one (1) or more of the purposes contained in its articles of incorporation;

(b)    Be the same as, or deceptively similar to, any trademark or service mark registered with the LDF or any other tribe, state or other sovereign, and shall be distinguishable upon the records of the Secretary of the Tribe from other business entity names.

44a.303 Articles of Incorporation.

(1)    The Articles of incorporation for Tribally owned corporations shall set forth:

(a)    The name of the corporation;

(b)    The purpose for which the corporation is organized;

(c)    The powers and/or limitations of the corporation;

(d)    The privileges and immunities of the corporation;

(e)    The immunity and waiver requirements, if any, of the corporation;

(f)    The principal place of business and mailing address of the corporation;

(g)    The duties and powers of the Board of Directors, including the power to adopt bylaws.

(h)    The selection, number and tenure of the Board of Directors;

(i)    The process to address resignation and removal of the Board of Directors;

(j)    The type of stock issued and number of shares authorized to be issued.

(k)    The operational requirements establishing the fiscal year and submission of the business plan to the Board of Directors;

(l)    The duration of the corporation, if other than perpetual, and method for dissolution.

(m)    The process to amend the articles of incorporation.

(n)    The name and mailing address of the incorporator.

(o)    The name, mailing address and location of the corporations registered agent;

44a.304 Ownership.

(1)    Every Tribally-owned Corporation created and organized under this Code shall have at all times at least fifty-one percent (51%) of the voting stock owned by the Tribe or subdivision thereof.

(2)   Voting stock in any Tribally-owned Corporation created pursuant to this chapter or owned by another LDF Tribally-owned Corporation may be alienated; provided that the Tribe maintains at least fifty-one percent (51%) Shareholder of the voting stock at all times.

44a.305 Assets.

(1)   The assets of any Tribally-owned Corporation created under this Code and Subchapter shall be separate and distinct from those of the Tribe.

(2)   Tribally assets not specifically pledged to the Tribally-owned corporation, in any manner permitted by law, shall not be considered assets of the corporation created under this Code or Subchapter for any purpose, except as otherwise provided by Tribal Council resolution.

44a.306 Audit.

The Tribal Council, by the terms of any Formation Documents or by duly adopted resolution, may require that any corporation created under this chapter be audited by an independent auditor hired by the Tribe at any time and shall retain the absolute right to require access to all corporate documents for any purpose.

44a.307 Annual Meeting -- Annual Report.

(1)   The Board of Directors and management of any Tribally-owned corporation created pursuant to this Code and Subchapter shall hold at least one (1) open meeting per year, on ten (10) business days public notice, within the LDF Reservation, at which the Board of Directors shall answer any questions asked of them by Tribal members or the Tribal Council.

(2)   The Board of Directors shall also file a full report of the financial and operational activities of the Tribally-owned Corporation with the Tribal Council on an annual basis.

44a.308 Contracts with Directors and Officers.

(1)   All Directors or Officers of the Tribally-owned Corporations created under this Code and Subchapter, and any firm in which the Directors or Officers hold office, or are substantial shareholders or owners, shall be disqualified from dealing or contracting, as a vendor, purchaser or otherwise, and such contracts shall be void, unless such contract or transaction has been fully disclosed to and approved by the Tribally-owned Corporation's Board of Directors;

(a)   This section does not apply if entity is another LDF Tribally-owned Business Organization created by this Code or the LDF Constitution.

(b)    This section does not apply to employment contracts of persons employed in full-time, management positions by the Tribally-owned Corporation.

(2)    Substantial Shareholders or Owners means greater than ten percent (10%) of the voting stock or ownership interest controlled by the Directors or Officers.

(a)    Shares of interests owned by family members shall be attributable to an individual Director or Officer for the purpose of determining control of voting stock or interests.

(b)    Family members shall mean the great grandparents, grandparents, parents, step-parents, brothers, sisters, children, grandchildren, grandchildren, and parents in-law and sisters/brothers in-law.

## 44a.309 Subsidiary Corporation.

(1)    Provided that the Corporation's Formation Documents grant such powers, any corporation created pursuant to this Code and Subchapter may, by obtaining authorization pursuant to the provisions in this Code from the Tribal Council, establish a subsidiary corporation or corporations in which the Tribe or the parent corporation retains not less than fifty-one percent (51%) of the voting stock of each subsidiary corporation.

(2)    A subsidiary corporation, its Board, officers and employees shall have all the same, purposes, powers, privileges, immunities as any other corporation established pursuant to this Code and Subchapter.

## Subchapter 4 – Tribally-owned Limited Liability Companies

## 44a.401 Organization.

(1)    The Tribally-owned Limited Liability Companies established under this Code and Subchapter shall be either Manager-managed or Member-managed pursuant to the terms of the Limited Liability Company's Operating Agreement.

(2)    The Tribal Council shall by resolution appoint the initial organizing managers of all Tribally-owned Limited Liability Companies created pursuant to this Code and Subchapter. The election or appointment of subsequent company managers or officers shall be governed by the provisions of organization.

(3)    An Operating Agreement for the Tribally-owned Limited Liability Company setting forth whether the Limited Liability Company is member-managed or manager-managed, and the rights, duties and obligations of members and managers shall be drafted and approved by the members of the Limited Liability Company upon filing its Articles of Organization with the Tribal Secretary.

**44a.402** Name.

    (1)    The  company name shall include the words "limited liability company" or "LLC"  in the name of every Tribally-owned limited liability company formed under this Code and Subchapter and, in addition, the company name may not:

        (a)    Contain a word or phrase which indicates or implies that it is organized  for a purpose other than the one (1) or more of the purposes contained in its articles of organization;

        (b)    Be the same as, or deceptively similar to, any trademark or service mark registered with the LDF or any other tribe, state or other sovereign,  and shall be distinguishable upon the records of the Secretary of the Tribe from other business entity names.

**44a.403** Articles of Organization.

    (1)    The Articles of Organization for Tribally owned limited liability companies shall set forth:

        (a)    The name of the company;

        (b)    The purpose for which the company is organized;

        (c)    The powers and/or limitations of the company;

        (d)    The privileges and immunities of the company;

        (e)    The sovereign immunities and waivers, if any, of the company;

        (f)    The principal place of business and mailing address of the company;

        (g)    Whether the Limited Liability Company is member-managed or manager-managed;

        (h)    The duties and powers of the Managers, including the power to adopt bylaws.

        (i)    The selection, number and tenure of the Managers;

        (j)    The process to address resignation and removal of the Managers;

        (k)    A Tribal ownership interest in the company and a statement that the Tribe will retain majority member ownership and voting rights in the company.

        (l)    The operational requirements establishing the fiscal year and submission of the business plan to the members;

(m)   The duration of the company and method for dissolution.

(n)   The process to amend the articles of organization.

(o)   The name and mailing address of the organizers.

(p)   The name, mailing address and location of the company's registered agent;

**44a.404 Operating Agreement.**

(1)   Each Limited Liability Company shall draft and approve an Operating Agreement governing the day-to-day operational control of the Limited Liability Company.

(2)   The Operating Agreement shall designate whether the Limited Liability Company is member-managed or manager-managed.

(a)   The Operating Agreement of a member-managed Limited Liability Company shall provide that all managerial control and business decisions shall be vested in a majority of the managers of the Limited Liability Company and that members have the ability to act on behalf of the Limited Liability Company.

(b)   The Operating Agreement of a manager-managed Limited Liability Company shall provide that all managerial control and business decisions shall be vested in a manager(s) appointed and hired by a majority of the members of the Limited Liability Company and that the manager(s) shall have the ability to act on behalf of the Limited Liability Company to the full extent allowable under the Articles of Organization and that the members do not have the ability to act on behalf of the Limited Liability Company.

**44a.405 Ownership.**

(1)   Every Tribally-owned Limited Liability Company created and organized under this Code shall have at all times at least fifty-one percent (51%) membership interest owned and retained by Tribe or subdivision thereof.

(2)   Membership interests in any Tribally-owned Limited Liability Company created pursuant to this Code or owned by another LDF Tribally-owned Business Organization may be alienated; provided that the Tribe maintains at least fifty-one percent (51%) membership interest at all times.

**44a.406 Assets.**

(1)   The assets of any Tribally-owned limited liability company created under this Code and Subchapter shall be separate and distinct from those of the Tribe.

(2)   Tribal assets not specifically pledged to the Tribally-owned limited liability company, in any manner permitted by law, shall not be considered assets of the company created under this Code or Subchapter for any purpose, except as otherwise provided by Tribal Council resolution.

44a.407 Audit.

(1)   The Tribal Council, by the terms or any charter or by duly adopted resolution, may require that any limited liability company created under this chapter be audited by an independent auditor hired by the Tribe at any time and shall retain the absolute right to require access to all company documents for any purpose.

44a.408 Annual Meeting – Annual Report.

(1)   The members and management of any Tribally-owned corporation created pursuant to this Code and Subchapter shall hold at least one (1) open meeting per year, on ten (10) business days public notice, within the LDF Reservation, at which the Board shall answer any questions asked of them by Tribal members or the Tribal Council.

(2)   Each manager shall also file a full report of the financial and operational activities of the Tribally-owned limited liability company with the Tribal Council on a quarter-yearly basis.

44a.409 Contracts with Managers and Officers.

(1)   All Managers or Officers of the Tribally-owned Limited Liability Companies authorized under this Code and Subchapter, and any firm in which the Managers or Officers hold office, or are substantial shareholders or owners, shall be disqualified from dealing or contracting, as a vendor, purchaser or otherwise, and such contracts shall be void, unless such contract or transaction has been fully disclosed to and approved by the Tribally-owned Limited Liability Company – either by its members or manager, as dictated by the Operating Agreement;

(a)   This section does not apply if entity is another LDF Tribally-owned corporation, limited liability company or other business entity created by this Code or the LDF Constitution.

(b)   This section does not apply to employment contracts of persons employed in full-time, management positions by the Tribally-owned limited liability company.

(2)   Substantial shareholders or owners mean greater than ten percent (10%) of the voting stock or ownership interest controlled by the manager(s) or member.

(3)   Membership interests owned by family members shall be attributable to an individual Manager or Officer for the purpose of determining control of voting rights or interests.

(4)   Family members shall mean the great grandparents, grandparents, parents, step-parents, brothers, sisters, children, grandchildren, grandchildren, and parents in-law and sisters/brothers in-law.

## 44a.410 Subsidiary Limited Liability Companies.

(1)   Provided that the Limited Liability Company's Formation Documents grant such powers any Limited Liability Company created pursuant to this Code and Subchapter may, by obtaining approval from the Tribal Council, establish a subsidiary Limited Liability Company in which the Tribe, subdivision thereof, or the parent Limited Liability Company retains not less than fifty-one percent (51%) membership interest of each subsidiary Limited Liability Company.

(2)   A subsidiary Limited Liability Company, its members, managers, officers and employees have all the same, purposes, powers, privileges, immunities as any other Limited Liability Company established pursuant to this Code and Subchapter.

### Subchapter 5 – Other Tribally Owned Business Entities

## 44a.501 Writing Required for Formation.

(1)   Formal agreements reduced to writing are required for any other Tribally-owned business entity that is not a Corporation or Limited Liability Company.

(2)   No person, entity or individual may infer an implied or apparent partnership or other Business Organization with the Tribe unless the Agreement is reduced to writing and in substantial compliance with this Code.

## 44a.502 Minimum Requirements of Written Agreements.

Any other business entity that is not a Tribally-owned Corporation or Limited Liability Company but formed pursuant to this Code shall:

(1)   Substantially comply with all provisions in Subchapters one (1) and two (2) of this Code;

(2)   Require a written Agreement or Formation Documents that are substantially similar to those required of Corporations in Subchapter three (3) or Limited Liability Companies in Subchapter four (4) and submit such documentation to the Tribal Secretary for filing;

(3)   Require a written Agreement or Articles of Formation providing for Ownership rights are substantially similar to those required of Corporations in Subchapter three (3) or Limited

Liability Companies in Subchapter four (4) and submit such documentation to the Tribal Secretary for filing;

(4)   Require a written Agreement or Formation Documents providing for Assets that are substantially similar to those required of Corporations in Subchapter three (3) or Limited Liability Companies in Subchapter four (4) and submit such documentation to the Tribal Secretary for filing;

(5)   Require a written Agreement or Formation Documents providing for Annual Meetings and Annual Reports that are substantially similar to those required of Corporations in Subchapter three (3) or Limited Liability Companies in Subchapter four (4) and submit such documentation to the Tribal Secretary for filing;

(6)   Require a written Agreement or Formation Documents providing for Contracts with Managers or Officers that are substantially similar to those required of Corporations in Subchapter three (3) or Limited Liability Companies in Subchapter four (4) and submit such documentation to the Tribal Secretary for filing.

**44a.503 No Sub-Business Entities Permitted.**

Unlike Corporations or Limited Liability Companies that are authorized to establish subsidiary corporations or companies, Business Organizations not formed as Corporations or Limited Liability Companies pursuant to this Code shall not form a subsidiary business entity.

**Subchapter 6 – Secured Transactions With Respect to Tribal Business Organizations**

**44a.601 Adoption by Reference.**

(1)   The Tribe adopts and incorporates by reference Article 9 of the Wisconsin Uniform Commercial Code, Wis. Stat. § 409.101 *et seq.*, as it may be amended from time to time (the "Wisconsin UCC9"), but subject to the exceptions and qualifications provided in this Code. In the event there is any conflict between this Code and the Wisconsin UCC9, this Code shall control.

(2)   This Subchapter 6 may be referred to as the "Tribal UCC9."

**44a.602 References.**

(1)   All references to the State of Wisconsin in Wisconsin UCC9 shall mean the Tribe.

(2)   Any references in the Wisconsin UCC9 may be referenced for purposes of this Code with the prefix "44a.6" instead of 409. For example, Section 409.102 of the Wisconsin UCC may be cited as Section 44a.6102 of this Code.

**44a.603 Characterization of Transactions.**

Any characterization of this Code of a transaction as a sale, lease, pawn, or other transaction shall control over any contrary provision in the Tribal UCC9.

44a.604 <u>Exceptions.</u>

The Tribe's adoption of the Wisconsin UCC9 is subject to the exceptions and comments listed in Appendix 1 to this Code.

44a.605 <u>Preservation of Sovereign Immunity and Exclusive Jurisdiction.</u>

Nothing in this Section or the Wisconsin UCC9 as adopted in this Code and Section shall be construed:

(1)    As a waiver of the Tribe's sovereign immunity or exclusive jurisdiction, including but not limited to the immunity of its entities, agents, officers, employees or elected officials; or

(2)    To grant jurisdiction to any other governmental agency or entity other than the Tribe.

### Chapter 44a – Appendix 1

| Wisconsin UCC9 Reference | Tribal UCC9 Exception or Comment |
| --- | --- |
| § 409.501 Filing Office | Tribal UCC9 § 44a.6501 shall read as follows:<br><br>Sec. 501. Filing Office<br><br>(1) Filing offices. , Unless otherwise provided by Tribal law, if the law of this Tribe  governs perfection of a security interest, the office in which to file a financing statement to perfect the security interest is the office of the Tribal Secretary. The Tribal Secretary shall mark any security interests so filed with the date and time such security interest was received and maintain any such recorded interests in searchable files so that members of the public may reasonably research the priority of security interests with respect to any property subject to the Tribe's jurisdiction that has also been the subject of some financing statement filed with the Tribal Secretary.<br><br>(2) If the Tribal Secretary receives a financing statement under subsection (1) for filing, and any debtor identified on the financing statement is an individual, the Tribal Secretary shall provide written notice of the filing of the financing statement to that debtor. The Tribal Secretary shall determine the form of the written notice and the written notice shall contain at least all of the following information: |

| | |
|---|---|
| | (a) The debtor's name and address as shown on the financing statement. |
| | (b) The secured party's name and address as shown on the financing statement. |
| | (c) The remedies available to the debtor under this act if he or she believes that the financing statement is erroneously or fraudulently filed. |
| | (3) In addition to the written notice described in subsection (2), the Tribal Secretary shall provide at no charge to a debtor described in that subsection a copy or image of the filed financing statement and any attachments. If the debtor requests additional copies or searches, the fees provided in section 9525 apply to that request. |
| | (4) A person shall not knowingly or intentionally file a false or fraudulent financing statement with the office of the secretary of state under subsection (1).  A violation of this subsection is punishable under Tribal law and/or other applicable laws. |
| § 409.612 Timeliness of notification before disposition of collateral | Tribal UCC9 § 44a.6612 shall read as follows: Sec. 612 Timeliness of notification before disposition of collateral A notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition. |
| § 409.620 Acceptance of collateral in full or partial satisfaction of obligation; compulsory disposition of collateral | Tribal UCC9 § 44a.6620 shall not include subsections (5) or (7) and any related references to those subsections. |
| § 440.624 Waiver | Tribal UCC9 § 44a.6624 shall not include any special treatment with respect to consumer-goods transactions. |
| § 409.625 Remedies for secured party's failure to comply with article | Tribal UCC9 does not incorporate § 409.625 |
| § 409.626 Action in which deficiency or surplus is an issue | Tribal UCC9 does not incorporate § 409.626 |
| Part VII. Transition | Tribal UCC9 does not incorporate Part VII. |

# Exhibit 4

# TRIBAL CODE

## CHAPTER 94

## TRIBAL CONSUMER FINANCIAL SERVICES REGULATORY ORDINANCE

### SECTION 1.  Findings, Intent and Policy

1.1     Findings. The Tribal Council of the Lac du Flambeau Tribe of Lake Superior Chippewa Indians of Wisconsin, the governing body of the Tribe, finds that:

(a)     The Tribe desires to expedite the development of the economy of the Tribe in order to improve the Tribe's economic self-sufficiency, to enable the Tribe to better serve the social, economic, educational, and health and safety needs of its members and visitors, and to provide its members with opportunities to improve their own economic circumstances.

(b)     Tribal operation and licensing of Consumer Financial Services businesses and Debt Collection businesses is a legitimate means of generating revenue to address the aforementioned needs and pursuing the Tribe's goal of self-sufficiency and self-determination.

(c)     The Tribe has the legal authority to license and regulate Consumer Financial Services businesses and Debt Collection businesses within its jurisdiction.

(d)     Properly licensed and regulated Consumer Financial Services and Debt Collection Activities is consistent with announced federal policy promoting tribal self-government and economic self-sufficiency.

(e)     Tribal regulation and control of Consumer Financial Services businesses and Debt Collection businesses within the jurisdiction of the Tribe is essential for the protection of the public welfare.

(f)     It is essential that the Tribal Council regulate Consumer Financial Services and Debt Collection Activities in a manner commensurate with Tribal law and policy and applicable federal law.

(g)     It is essential that public confidence in Consumer Financial Services and Debt Collection Activities that take place within the Tribe's jurisdiction be maintained.

(h)     Adoption of a Tribal Consumer Financial Services Regulatory Ordinance by the Tribal Council is a necessary condition for the legal operation of Consumer Financial Services and Debt Collection Activities within the Tribe's Reservation and is in the best interest of the Tribe.

(i)     Establishment of a Tribal Consumer Financial Services Regulatory Authority to implement the purpose and intent of the Tribal Consumer Financial Services Regulatory Ordinance within the Tribe's Reservation is in the best interest of the Tribe.

1.2     Intent. The Tribal Council, on behalf of the Tribe, declares that the intent of this Ordinance is to:

(a)     Diversify and expedite the development of the economy of the Tribe's Reservation for the purposes described in section 1.1(a) above.

(b)     Define general regulatory powers to be exercised by a Tribal Consumer Financial Services Regulatory Authority in relation to the regulation, control, and oversight of Consumer Financial Services businesses and Debt Collection businesses and their Vendors.

(c)     Ensure that all Consumer Financial Services business and Debt Collection business profits are used for the benefit of the Tribe's government and its members and are used to improve the Tribe's economic self-sufficiency, to enable the Tribe to better serve the social, economic, educational, health, and safety needs of its members and visitors, and to provide its members with opportunities to improve their own economic circumstances.

(d)     Ensure that Consumer Financial Services and Debt Collection Activities are conducted appropriately by Licensees and Consumers and that it remains free from corrupt, incompetent, unconscionable, unfair, and dishonest practices.

(e)     Protect the interests of the public in the offering of Consumer Financial Services and Debt Collection Activities.

(f)     Ensure the maintenance of public confidence in Tribal Consumer Financial Services practices.

(g)     Ensure that the Tribe provides a Tribal-based forum for the fair and orderly resolution of Consumer Financial Services and Debt Collection disputes consistent with the Tribe's preservation of sovereign immunity.

(h)     Ensure that Tribal Consumer Financial Services laws are enforced by the Tribe upon Persons involved in Tribal Consumer Financial Services and Debt Collection Activities.

1.3     Policy.

(a)     Tribal Policy of Self-Government. The Tribe is firmly committed to the principle of Tribal self-government. Profits from Consumer Financial Services and Debt Collection Activities shall be utilized and expended only for the following purposes:

(1)     To fund the Tribe's government operations or programs.

(2)     To provide for the public health and general welfare of the Tribe and its members and visitors to the Tribal community.

(3)     To promote Tribal economic development and self-sufficiency.

(4)     To donate to charitable organizations.

(b)    Tribal Consumer Financial Services Policy.  The establishment, promotion and operation of Consumer Financial Services and Debt Collection Activities are necessary, provided that such Consumer Financial Services and Debt Collection Activities are regulated and controlled by the Tribe pursuant to this Ordinance and the profits of such Consumer Financial Services and Debt Collection Activities are used exclusively for the benefit of the Tribe.

(c)    Responsibility for Regulation.  The Tribe shall have the sole proprietary interest in and responsibility for the conduct of Consumer Financial Services and Debt Collection Activities authorized by this Ordinance.

(d)    Consumer Financial Services and Debt Collection Activities Authorized. Consumer Financial Services and Debt Collection Activities that are subject to licensing under this Ordinance are authorized and permitted only as described in this Ordinance and any regulations of the Authority adopted under this Ordinance.

## SECTION 2.  GENERAL PROVISIONS

2.1    Authority.  This Ordinance is enacted pursuant to the inherent sovereign powers of the Lac du Flambeau Tribe of Lake Superior Chippewa Indians of Wisconsin and in accordance with the Tribe's Constitution.

2.2    Applicability. This Ordinance applies to Loans made by the Lender and to include modifications, refinancing, consolidations, deferrals consummated within the Tribe's jurisdiction. For purposes of this Ordinance, a Loan is deemed consummated within the Tribe's jurisdiction and therefore subject to the Ordinance when a Consumer completes and sends to the Lender, either electronically or through other means of delivery, a written agreement evidencing the Consumer's signed agreement to enter into a Loan.

2.3    Construction.  In construing the provisions of this Ordinance, the following shall apply:

(a)    The provisions of this Ordinance, being necessary for the benefit of the Tribe and its members, shall be liberally construed to effectuate its purpose and to promote substantial justice.

(b)    The Findings, Intentions, and Policies stated in Section 1 constitute the standards to be observed by the Authority in the exercise of its discretionary powers under the Ordinance, in the adoption of implementing regulations, in the issuance of orders and declaratory statements, in the examination and supervision of Licensees, and in all matters of construction and application of the Ordinance required for any determination or action by the Authority.

(c)    No Person acting, or who has acted, in good faith reliance upon a rule, order, or declaratory statement issued by the Authority shall be subject to any criminal, civil, or administrative liability for such action, notwithstanding a subsequent decision by a court of competent jurisdiction invalidating the rule, order, or declaratory statement. In the case of an order or a declaratory statement that is not of general application, no Person other than the Person to whom the order or declaratory statement was issued is entitled to rely upon it, except

upon material facts or circumstances that are substantially the same as those upon which the order or declaratory statement was based.

## SECTION 3. DEFINITIONS

In this Ordinance, except where otherwise specifically provided or unless the context otherwise requires, the following terms and expressions shall have the following meanings:

3.1    "Agent" means any person appointed by the Tribal Council as an officer of the Authority, as that term is defined herein, while engaged in or on account of the performance of official duties.

3.2    "Applicant" means any Person who has applied for a License under the provisions of this Ordinance.

3.3    "Application" means a request for the issuance of a License under the provisions of this Ordinance.

3.4    "Authority" means the Tribal Consumer Financial Services Regulatory Authority, created and established by the Tribal Council of the Tribe, charged with the implementation and enforcement of the Tribal Consumer Financial Services Regulatory Ordinance and all other regulations promulgated by the Authority or the Tribe relating to Consumer Financial Services activities and associated licensing requirements.

3.5    "Consumer" means a natural person who acquires goods, services, or credit primarily for personal, family or household purposes.  The term does not include a person who acquires goods, services, or credit primarily for business, commercial, or investment purposes.

3.6    "Consumer Financial Services" or "Tribal Consumer Financial Services" means the business of providing goods, services, or credit to consumers in transactions subject to this Ordinance in exchange for interest, finance charges, fees, rent, or other form of consideration on the Tribe's reservation or within the Tribe's jurisdiction, including transactions originated from the Tribe's reservation or Tribe's jurisdiction.  The term includes, without limitation, short-term loans, small dollar loans, credit sales, pawn transactions, sale-leaseback transactions, rent-to-own transactions, guaranties, letters of credit, or other forms of Consumer Financial Services.

3.7    "Debt Collection Activities" means all activities associated with purchasing debt from a creditor and collecting debt from a Consumer.

3.8    "Debt Collection Licensee" means a Person that is licensed by the Authority to engage in Debt Collection Activities.

3.9    "Electronic Funds Transfer" means a draft or agreement for an electronic debit authorized by a Consumer and made payable to a Financial Services Licensee or Debt Collection Licensee.

3.10    "Employee Licensee" means a person that is licensed by the Authority to be employed by a Financial Services Licensee or a Tribal Debt Collection Licensee.

3.11    "Financial Services Licensee" means the one hundred percent (100%) Tribally owned and operated entity that is licensed by the Authority to engage in the business of providing Tribal Consumer Financial Services.

3.12    "License" means the official, legal and revocable Financial Services License, Vendor License, Employee License, or Debt Collection License, issued by the Authority. A License issued pursuant to this Ordinance is a revocable privilege.

3.13    "Lender" or means any Licensee that offers or facilitates the processing of a Loan through any method including storefront, mail, telephone, internet, or any electronic means.

3.14    "Licensee" means any Financial Services Licensee, Vendor Licensee, Employee Licensee, and Debt Collection Licensee whenever used generally in this Ordinance.

3.15    "Ordinance" means this Tribal Consumer Financial Services Regulatory Authority Ordinance.

3.16    "Person" means any natural person, partnership, joint venture, association, trust, firm, estate, club, society, receiver, assignee, trustee in bankruptcy, political entity, company, corporation or other group, however organized, and any owner, director, officer or employee of any such entity or any group of individuals acting as a unit, whether mutual, cooperative, fraternal, nonprofit, or otherwise, the government of the Tribe, any governmental entity of the Tribe or any of the above listed forms of business entities that are wholly owned or operated by the Tribe, or any other entity whatsoever, who engages or seeks to engage in the business of consumer financial services pursuant to this Ordinance; provided, that the term does not include the Federal Government or any agency thereof.

3.17    "Receivable" or "Receivables" mean all rights to payment of indebtedness and obligation (including without limitation, unpaid principal, accrued interest, costs, fees, expenses and indemnity obligations) owing by an Consumer in respect of a loan or loans or other financial accommodations made or extended for the benefit of such Consumer as such rights to payment of indebtedness and obligations have been sold and assigned to a Debt Collection Licensee.

3.18    "Reservation" means the Tribe's land held in trust by the federal government for the benefit of the Tribe and all other land, trust or fee, which is within the Tribe's jurisdiction.

3.19    "Tribal Council" means the Lac du Flambeau Tribe of Lake Superior Chippewa Indians of Wisconsin Tribal Council, the governing body of the Tribe as defined and described in Article III of the Tribe's Constitution.

3.20    "Tribal Debt Collection Licensee" means a Debt Collection Licensee that is wholly-owned by the Tribe.

3.21    "Tribe" means the Lac du Flambeau Tribe of Lake Superior Chippewa Indians of Wisconsin.

3.22   "Vendor" means a Person or entity that provides services aiding a Financial Services Licensee or Debt Collection Licensee.

3.23   "Vendor Licensee" means a Vendor that is licensed by the Authority to provide services aiding the Financial Services Licensee or Debt Collection Licensee unless otherwise exempt by Section 6.

## SECTION 4. TRIBAL CONSUMER FINANCIAL SERVICES REGULATORY AUTHORITY

4.1   Establishment and Purpose. The Tribal Council hereby charters, creates and establishes the Tribal Consumer Financial Services Regulatory Authority ("Authority") as a governmental subdivision of the Tribe. The Authority has charge of the implementation of the Tribal Consumer Financial Services Regulatory Ordinance and regulations of the Tribe relating to business activities and associated licensing requirements.

4.2   Location and Place of Business. The Authority may maintain its headquarters, principal place of business and office within the Tribal offices. The Authority may, however, with a majority vote from the Tribal Council, establish other places of business in such other locations as the Authority may from time to time determine to be in the best interest of the Tribe.

4.3   Duration. The Authority shall have perpetual existence and succession in its own name, unless dissolved by the Tribal Council pursuant to Tribal law.

4.4   Attributes. As a governmental subdivision of the Tribe, the Authority is under the direction and control of the Tribal Council, and it is the purpose and intent of the Tribal Council that the operations of the Authority be conducted on behalf of the Tribe for the sole benefit and interests of the Tribe, its members, residents of, and visitors to the Tribe's Reservation.

(a)   Arm of Tribe.  In carrying out its purposes under this Ordinance, the Authority shall function as an arm of the Tribe.  To fund necessary government function and regulatory oversight, the Authority may, upon receiving any necessary approvals from the Tribal Council or general membership, impose a fee or tax on any Financial Services Licensee or Tribal Debt Collection Licensee, and make payment of such a fee or tax subject to a Financial Services Licensee's or Tribal Debt Collection Licensee's existing agreements or business relationships, as a condition of its Financial Services License remaining in good standing.

(b)   Tribal Actions. Notwithstanding any powers delegated to the Authority under this Ordinance, the Tribe reserves to itself the right to bring suit against any Person or entity in its own right, on behalf of the Tribe or on behalf of the Authority whenever the Tribe deems it necessary to protect the sovereignty, rights and interests of the Tribe, the Authority, or the Licensee.

4.5   Sovereign Immunity of the Authority.

(a)   Immunity from Suit. The Authority, as an arm of the Tribe, is cloaked by Tribal and federal law with all the privileges and immunities of the Tribe, except as specifically limited by this Ordinance, including sovereign immunity from suit in any tribal, federal or state court.

(b)      No Waiver.  Nothing in this Ordinance shall be deemed or construed to be a waiver of sovereign immunity of the Authority from suit in state or federal court. Any waiver shall be made pursuant to subsection (d), below.

(c)      No Consent to Jurisdiction.  Nothing in this Ordinance shall be deemed or construed to be a consent of the Authority to the jurisdiction of the United States or of any state or of any other Tribe with regard to the business or affairs of the Authority.

(d)      Waiver of Sovereign Immunity of the Authority.  Sovereign immunity of the Authority may be waived upon the recommendation of the Authority and only by express resolution of the Tribal Council.

(1)      Resolution Effecting Waiver.  All waivers of sovereign immunity must be authorized and approved by written resolutions of continuing force and effect issued by the Tribal Council.

(2)      Policy on Waiver.  Waivers of sovereign immunity are disfavored and shall be granted only when necessary to secure a substantial advantage or benefit to the Authority or the Tribe.

(3)      Limited Nature to Waiver.  Waivers of sovereign immunity shall not be general but shall be specific and limited as to duration, grantee, transaction, property or funds, if any, of the Authority subject thereto, and the court having jurisdiction pursuant thereto and law applicable thereto.

(4)      Limited Effect of Waiver.  Neither the power to sue and be sued, nor any express waiver of sovereign immunity by resolution of the Tribal Council shall be deemed a consent to the levy of any judgment, lien or attachment upon property of the Authority other than property specifically pledged or assigned, a consent to suit with respect to any land within the exterior boundaries of the Tribe's Reservation, or a consent to the alienation, attachment or encumbrance of any such land.

4.6      Sovereign Immunity of the Tribe. With respect to the existence and activities of the Authority, all inherent sovereign rights of the Tribe as a Federally-recognized Indian Tribe are hereby expressly reserved, including sovereign immunity from suit in any state, federal or tribal court. Nothing in this Ordinance nor any action of the Authority shall be deemed or construed to be a waiver of sovereign immunity from suit or counterclaim of the Tribe, a consent of the Tribe to the jurisdiction of the United States, any state or other tribe with regard to the business or affairs of the Authority or the Tribe, a consent of the Tribe to any cause of action, counterclaim, case or controversy, or to the levy of any judgment, lien or attachment upon any property of the Tribe, a consent to suit or counterclaim in respect to any land within the exterior boundaries of the Tribe's reservation, or to be a consent to the alienation, attachment or encumbrance of any such land.

4.7      Assets of the Authority. The Authority shall have only those assets specifically assigned to it by the Tribal Council, acquired in its name by the Tribe, or acquired by the Authority on its own behalf. No activity of the Authority or any indebtedness incurred by it shall

implicate or in any way involve any assets of tribal members or the Tribe not assigned in writing to the Authority.

    4.8    <u>Regulatory Agents; Compensation, Duties.</u>

    (a)    Regulatory Agents; Council Oversight. The Authority shall be composed of at least one but not more than three Agents appointed by the Tribal Council. The Agents will be employees of the Tribe and subject to the Tribe's employment policies and professional and ethics standards. The Tribal Council will supervise the Agents for employment purposes.

    (b)    Term of Office.    Agents shall serve three (3) year terms unless an Agent is removed or otherwise replaced by the Tribal Council, or the Agent's term is extended. There are no limits to the number of terms a person may serve.

    (c)    Staggered Terms. The Tribal Council shall not replace more than one Agent per calendar year unless necessitated by subsection 4.11 based on events beyond the control of the Tribal Council. The Tribal Council may extend any Agent's term as necessary to comport with this subsection.

    (d)    Compensation. The compensation of the Agents shall be established from time to time by the Tribal Council.

    (e)    Duties. The Agents shall have responsibilities that include but are not limited to:

        (1)    By majority vote, the Agents may elect a Chairman who will oversee and have responsibility for the day-to-day operations of the Authority, including supervision of Authority employees;

        (2)    Accept service of process; and

        (3)    Conduct or oversee the conduct of any meetings or hearings held by the Authority in accordance with this Ordinance or further directive of the Tribal Council.

        (4)    The Agents may identify additional duties and assign particular duties to an Agent or an Authority employee. Compensation shall be submitted to the Tribal Council with the Authority's annual budget approved by the Tribal Council.

    (f)    Agent Qualifications. Any person appointed as an Agent of the Authority shall meet the following qualifications:

        (1)    The Agents shall be enrolled members of the Tribe.

        (2)    An Agent shall have expertise, experience, education or a combination thereof in the following areas: financial services, finance, management, business, governmental regulation, law, and/or Tribal policy.

(3)     An Agent shall be at least twenty-one (21) years of age and show proof of High School Diploma or equivalent.

(4)     No person shall serve as an Agent if:

A.     His/her prior activities, criminal record, if any, or reputation, habits or associations:

i.     Pose a threat to the public interest; or

ii.    Threaten the effective regulation and control of financial services; or

iii.   Enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of financial services.

B.     He/she has been convicted of or entered a plea of no contest to any felony or to a misdemeanor involving breach of trust or dishonesty in any jurisdiction; or

C.     He/she, or any member of his or her Immediate Family has an ownership, partnership or other direct monetary or financial interest in the conduct of any Licensee or is in privity with a Financial Services Licensee or Tribal Debt Collection Licensee, or one of its agents, contractors, or sub-contractors; or if he or she has any other personal or legal relationship that places him/her in a conflict of interest with any Licensee. For purposes of this subsection, "Immediate Family" includes spouse or significant other, parents, children, and siblings. Ownership of a Licensee by virtue of membership in the Tribe is not a per se monetary or financial interest in the conduct of any Licensee.

4.9     <u>Non-Voting Agent</u>.     In addition to the Agents appointed pursuant to Section 4.8(a), the Council has full discretion whether to appoint a Non-Voting Agent to serve as a Non-Voting Agent of the Authority who has sufficient expertise in banking and finance, regulatory enforcement, or public policy and whose professional experience will aid the Authority with national outreach and federal and Tribal policy development. A Non-Voting Agent, shall not be an employee or have any interest in any Licensee or Vendor.

4.10    <u>Meetings</u>. Meetings of the Authority shall occur in the manner described herein.

(a)     Regular Meetings. The Authority shall meet at least twice, but no more than four times, per month at such dates, times, and locations as agreed upon by the majority of the Agents. In no event shall meetings of the Authority exceed forty-eight (48) regular meetings per year without prior Tribal Council approval.

(b)     Special Meetings. In addition, two (2) of the three (3) Agents, upon seventy-two (72) hours written notice to each member, may call special meetings but only for the purpose of exercising enforcement authority prescribed under this Ordinance or as necessary to deal with

issues involving emergency or exigent circumstances requiring the immediate attention of the Authority.

      (c)    Meeting Conduct. The Authority shall conduct meetings in the manner described herein.

          (1)    The Authority shall keep a complete and accurate record of all its meetings.

          (2)    A majority of the Agents shall constitute a quorum for the transaction of any business, for the performance of any duty, or for the exercise of any power which this Ordinance requires the Authority to transact, perform, or act.

          (3)    The Authority may conduct meetings in closed session to protect the integrity of personnel matters, background investigations or enforcement actions.

      (d)    Confidentiality. All records of the Authority are confidential records of the Tribe and may not be released without Tribal Council approval.

      4.11    Prohibited Acts. The Agents and Authority employees shall not do any of the following with respect to any Licensee under the jurisdiction of the Authority:

      (a)    Be indebted, either directly or indirectly, as Consumer unless such indebtedness was contracted before becoming employed by or appointed to the Authority and is fully disclosed to the Council.

      (b)    Be an officer, director, or employee of any Licensee or lender to the Tribe.

      (c)    Be interested in, directly or indirectly, or receive from any Licensee or any officer, director, or employee of any Licensee any salary, fee, compensation or other valuable thing by way of gift, donation, credit, or compensation for services or otherwise; except that Agents and Authority employees are permitted to receive a pro-rata share of revenue that has been generated by a Licensee and is distributed among all eligible Tribal members by virtue of membership in the Tribe.

      4.12    Removal of Regulatory Agent / Vacancy.

      (a)    Cause for Removal. An Agent may be removed by the Tribal Council for any of the following reasons: serious inefficiency, neglect of duty, malfeasance, misfeasance, nonfeasance, misconduct in office, or for any conduct which threatens the honesty and integrity of financial services or the Authority or violates the intent of this Ordinance.

      (b)    Notice; Hearing; Removal. If there is cause for removal, an Agent shall be given a written notice of the specific charges against him or her. The Tribal Council shall schedule a hearing at least ten (10) days after notice was delivered to the Agent. Agents subject to removal will be given an opportunity to provide evidence rebutting the grounds for their proposed

removal before the removal is considered. A vote of the Tribal Council on the validity of the removal shall be final and not subject to further appeal.

(c)     Vacancy. In the event of a vacancy, the Tribal Council shall appoint another qualified person to fill the position. The term of office of the appointee shall be for the balance of the unexpired term for the position.

4.13   Powers of the Authority. The Authority has the power and responsibility to discharge all duties imposed by law and this Ordinance, including but not limited to:

(a)     To promulgate, adopt, and enforce regulations and rules furthering the purpose and provisions of this Ordinance; provided that such regulations shall take effect only upon approval of the Tribal Council.

(b)     To examine or inspect or cause to be examined or inspected each Licensee annually and more frequently if the Authority considers it necessary.

(c)     To make or cause to be made reasonable investigations of any Licensee or Person as it deems necessary to ensure compliance with this Ordinance or any order of the Authority, to determine whether any Licensee or Person has engaged, is engaging or is about to engage in any act, practice or transaction that constitutes an unsafe or unsound practice or violation of this Ordinance or any order of the Authority; or to aid in adopting rules or regulations pursuant to this Ordinance.

(d)     To establish procedures designed to permit detection of any irregularities, fraud, or the like.

(e)     Upon prior explicit resolution and approval of the Tribal Council, to employ such advisors as it may deem necessary. Advisors may include, but are not limited to, lawyers, accountants, law enforcement specialists and financial services professionals.

(f)     To accept, review, approve or disapprove any Application, including conducting or arranging for background investigations of all Applicants.

(g)     To examine under oath, either orally or in writing, in hearings or otherwise, any Licensee or Person, or agent, officer or employee of any Financial Services Licensee or Tribal Debt Collection Licensee, or any other witness with respect to any matters related to this Ordinance and to compel by subpoena the attendance of witnesses and the production of any books, records, and papers with respect thereto. Upon refusal to appear or produce, the Authority may apply to a court of competent jurisdiction to compel appearance or production.

(h)     To make, or cause to be made by its Agents or employees, an examination or investigation of the place of business, equipment, facilities, tangible personal property and the books, records, papers, vouchers, accounts, documents and financial statements of any Licensee or Person engaging or participating in, or suspected to be engaging or participating in, Consumer Financial Services.

(i)     To discipline any Licensee or Person engaging or participating in Consumer Financial Services in violation of this Ordinance by ordering immediate compliance, issuing fines and sanctions, and suspending or revoking any License pursuant to the hearings and due process required by Section 4.17 of this Ordinance.

(j)     To arbitrate, compromise, negotiate or settle any dispute to which it is a party relating to the Authority's authorized activities, subject to any approval that may be required by the Tribal Council.

(k)     To adopt a schedule of fees to be charged for the processing Applications and issuance and renewal of Licenses, including fees or charges associated with conducting background checks; for reasonable examinations of Licensees; and, for services rendered relating to transcripts and the furnishing or certifying of copies of proceedings, files, and records and to impose the forgoing fees as applicable.

(l)     To establish and maintain such bank accounts as may be necessary or convenient.

(m)     To make such findings as may be necessary to implement the Authority's duties and powers, with such findings to be given deference as the legally binding findings of a governmental entity.

(n)     To counsel Lenders and Consumers on their rights and duties under this Ordinance.

(o)     Establish programs for the education of Consumers with respect to credit practices and problems.

4.14     Investigations, Right of Entrance.

(a)     Investigations. The Authority, upon petition, complaint or upon its own initiative or whenever it may deem it necessary in the performance of its duties or the exercise of its powers, may investigate and examine the operation and premises of any Licensee or Person engaging or suspected to be engaging in Consumer Financial Services within its jurisdiction.

(1)     In undertaking such investigations, the Authority may request the assistance of federal or local law enforcement officials, legal counsel and/or other third parties.

(2)     In conducting such investigation, the Authority shall make no order or final decision without affording any affected party notice and a hearing pursuant to Section 4.17 of this Ordinance.

(b)     Right of Entrance. The Authority and duly authorized employees or Agents of the Authority, during regular business hours, may reasonably enter upon any tribal premises of any Licensee, or Person engaging in or suspected to be engaging in Tribal Consumer Financial Services for the purpose of making inspections and examining the accounts, books, papers and documents of any such Licensee, or Person.

(c)     Aid to Entry.  The staff of the Licensee, or Person engaging in or suspected to be engaging in Tribal Consumer Financial Services shall facilitate such inspection or examinations by giving every reasonable aid to the Authority and to any properly authorized officer or employee.

4.15   Annual Budget.  The Authority shall prepare an annual operating budget for all Authority activities and present it to the Tribal Council in the time and manner established by the Tribal Council.

4.16   Authority Regulations.

(a)     Regulations necessary to carry out the implementation and orderly performance of the Authority's duties and powers shall include, but shall not be limited to, the following:

(1)     The making of findings or other information required by or necessary to implement this Ordinance;

(2)     Interpretation and application of this Ordinance, as may be necessary to enforce the Authority's duties and exercise its powers;

(3)     A regulatory system for overseeing Consumer Financial Services, including accounting, contracting, management and supervision;

(4)     The conduct of inspections, investigations, hearings, enforcement actions and other powers of the Authority authorized by this Ordinance; and

(5)     Specification of the amount and the schedule of Application and examination fees that shall be imposed by the Authority.

(b)     Promulgation of Regulations.  The Authority may promulgate regulations as follows:

(1)     The Tribal Council, the Authority, or any Licensee may request the promulgation of a regulation by submitting a written request and draft of the proposed regulation to the Authority;

(2)     Within 30 days, the Authority will review the request and proposed regulation to ensure it does not conflict with this Ordinance or any applicable law;

A.     If the proposed regulation conflicts with this Ordinance or any applicable law, the Authority may revise the proposed regulation to conform to this Ordinance or other applicable law, or return the proposal with an explanation of any nonconformity to the submitting Person for further review.

B.     If the proposed regulation does not conflict with this Ordinance or any applicable law, the Authority will notify the Tribal Council, the

submitting Person, and any Licensees that may be affected by the proposed regulation by means reasonably calculated to inform the Tribal Council and all affected Persons;

(3)     After notice is sent, unless exigent circumstances exist, the Authority will allow at least 30 days for the Tribal Council and any affected Persons to submit written comments on the proposed regulation that support, oppose, or suggest amendments to the proposed regulation. When exigent circumstances exist, the Authority may promulgate a regulation without a comment period, and any Licensee or Person affected may protest the regulation by following the procedure detailed in 4.16(b)(5). Upon promulgation of any regulation under exigent circumstances, within 7 days, the Authority will notify the Tribal Council of the promulgated regulation and the exigent circumstances.

(4)     After the comment period has expired:

A.     If the proposed regulation is unopposed, the Authority will shall promulgate and publish the proposed regulation by majority vote and it will be implemented;

B.     If the proposed regulation is opposed or amendments are proposed, the Authority may either decline to promulgate the regulation or abandon the proposed regulation, amend the proposed regulation, or conduct a hearing on the proposed regulation to allow interested parties to advocate on the proposal.

C.     If the Authority declines to promulgate the proposed regulation, it will notify the Tribal Council and all affected Persons or conduct a hearing on the proposed regulations for additional input to determine whether to promulgate and implement the proposed regulation.

D.     If the Authority amends the proposed regulation, it will re-notify the Tribal Council and Licensees as required by 4.16(b)(2)(ii) and revisit the procedure in 4.16(b)(4)-(5).

(5)     Tribal Council Review. Within 30 days after the Authority promulgates or declines to promulgate a regulation, a Licensee may request a Tribal Council review of the Authority's decision.

A.     A Licensee may submit a written request for a Tribal Council review to the Authority. The written request must detail the basis for the Tribal Council review.

B.     The Authority will forward to the Tribal Council the written request for review, the proposed regulation at issue, a written explanation of the bases for the Authority's decision to promulgate or not to promulgate the proposed regulation, and an agenda request to appear

before the Tribal Council. The Authority will send copies of this submission to the Licensee requesting the Tribal Council review.

C.      The Tribal Council may accept or deny the request to review the Authority's decision. If the Tribal Council declines the request to review the Authority's decision, the Authority's decision on the proposed regulation is final. If the Tribal Council grants the request to review the Authority's decision, the Tribal Council may proceed to review the Authority's decision in any manner it deems appropriate.

(c)      The Tribal Council may promulgate or rescind any regulation at any time by majority vote. The Tribal Council is in no way bound by this Section.

(d)      Only regulations promulgated by this procedure or promulgated by the Tribal Council will be enforceable.

4.17      Report to the Tribal Council. The Authority shall file reports with the Tribal Council summarizing reports received from each Licensee, investigations undertaken, licensee violations and other activities undertaken by the Authority to keep the Tribal Council fully informed as to the status of the Authority's activities. The Authority shall define by regulation, subject to the approval of the Tribal Council, the schedule for the submission of such reports.

4.18      Notice and Opportunity to Cure; Due Process; Notice; Hearings; Examiner. For a violation of this Ordinance or denial of an Application, the Authority shall provide notice and the opportunity for a hearing comporting with notions of due process if it is to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder. At the discretion of the Authority, the Authority may provide a reasonable opportunity to cure before it initiates any enforcement action. If emergency enforcement action is taken based upon a showing of exigent circumstances or good cause, and the Authority shall provide notice and an opportunity to be heard within fourteen (14) days of the occurrence of such enforcement action to allow an aggrieved party an opportunity to object to the enforcement action.

(a)      Upon receipt of any notice of violation, a Licensee may request a stay of any enforcement action to allow time to cure or to work with the Authority towards a voluntary resolution.

(b)      No Hearing, Voluntary Resolution. Whenever it shall appear to the satisfaction of the Authority that all of the interested parties involved in any dispute or concern have agreed concerning the matter at hand, the Authority may dismiss an enforcement action or approve resolution of the issue, as appropriate, without a hearing.

(c)      Notice of Hearing. A written notice shall set forth, with specificity, the issues to be resolved and the date and time at which a hearing shall be conducted.

(d)      Hearing.

(1)      Except as determined by the Authority, a hearing should be scheduled between ten (10) and thirty (30) business days after the notice of hearing is delivered.

(2)     At the hearing, the affected parties shall be provided the opportunity to present oral or written evidence.  An affected party shall have an opportunity to cross-examine opposing witnesses, and to present any other evidence as to why a denial, suspension, or revocation order should not be issued.

(3)     Hearings shall be open to all people interested therein as determined by the Authority.

(4)     The hearing shall be governed in all respects in accordance with Tribal law and Authority regulations. Any suspension or revocation decision of the Authority after hearing may be appealed in accordance with the provisions of Section 4.17(f).

(e)     Examiner.  The Authority's Agent(s) shall act as examiner for the purpose of any hearing, or the Authority may appoint an examiner qualified in the law or possessing knowledge or expertise in the subject matter of the hearing for the purpose of conducting any hearing. Any such appointment shall constitute a delegation to such examiner of the powers of the Authority under this Ordinance with respect to any such hearing.

(f)     Decision.  The Authority shall issue a written decision to all affected parties within thirty (30) days after the hearing.

(g)     Appeals.  Affected parties may appeal an Authority determination by filing a written appeal to the Tribal Court within twenty (20) days of receiving the Authority's final written decision.

## SECTION 5. LICENSES

5.1     Applicability.  Unless exempt as described in Section 6, any Person or Vendor seeking to engage in Tribal Consumer Financial Services or Tribal Debt Collection Activities subject to this Ordinance or, when applicable, be employed by a Financial Services Licensee or Tribal Debt Collection Licensee, or Vendors, shall apply for and receive all required licenses prior to engaging in Tribal Consumer Financial Services or Tribal Debt Collection Activities, or being employed by a Financial Services Licensee or Tribal Debt Collection Licensee.

(a)     A License is a revocable privilege to do business within the jurisdiction of the Tribe.

5.2     Application Procedure.

(a)     Submission to Authority.  An Applicant shall submit an Application to the Authority on such form as the Authority may require.

(b)     Application Contents.  At a minimum, the Application shall contain the following information:

(1)     For Applicants that are other than natural persons,

-16-

A.      Each of the Applicant's owners, officers and/or directors; and principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager;

B.      Each of its owners or partners, if an unincorporated business;

C.      Each of its shareholders who own more than ten (10) percent of the shares of the corporation;

(2)      All natural persons identified on any Application shall include his criminal and civil record, if any, an explanation of any crimes for which he has been convicted, or to which he has entered a plea of no contest, civil suits in which a judgment has been entered against him, and a complete disclosure of any pending or anticipated civil or criminal action against him in any jurisdiction. Each natural person identified on any Application shall provide written permission giving the Authority or its designees the right to investigate his background, including his criminal record;

(3)      An Applicant for an Employee License shall provide all necessary information and written permission for the Authority or its designee to obtain the Applicant's credit history and/or credit score;

(4)      An Application shall list of all Consumer Financial Services-related or Debt Collection-related licenses the Applicant has ever applied to the Authority for, whether or not such licenses were issued;

(5)      An Application shall describe the Applicant's proposed business including the type of Consumer Financial Services it intends to engage in;

(6)      The Applicant shall disclose  whether there is a previous contractual relationship with any Indian Tribe; and

(7)      The Applicant shall execute a sworn statement that if the License applied for is issued, the Applicant will submit to the jurisdiction of the Tribe; the Applicant will abide by all applicable Tribal and Federal laws, regulations and policies; and the information contained in the Application is true and correct to the best of Applicant's knowledge.

(8)      Each Consumer Financial Services, Debt Collection, and Vendor Application shall be accompanied by an application fee, the amount of which shall be set by the Authority.  There is no fee for Employee Licensee Applications.

5.3      Review, Issuance and Denial, Term.

(a)      Consumer Financial Services License or Tribal Debt Collection License.  A Consumer Financial Services License or Tribal Debt Collection License shall automatically issue if the following criteria are met:

(1)      The Application complied with Section 5.2;

-17-

(2)     The Consumer Financial Services or Debt Collection Activities are authorized pursuant to this Ordinance;

(3)     The Consumer Financial Services or Debt Collection Activities are authorized by a Tribal Council Resolution; and

(4)     The Tribe has the sole ownership interest in the Tribal enterprise that provides the Consumer Financial Services or Debt Collection Activities.

(b)     Employee and Vendor License.  Upon compliance with Section 5.2, the Authority shall review the qualifications of the Applicant sufficient to make a determination of eligibility as required under this Ordinance.

(c)     Issuance.  Upon completion of any necessary background investigation, the Authority may issue a License on a conditional or unconditional basis. The Authority may in its discretion grant a temporary License after submission of a completed application and a preliminary determination of suitability by the Authority.

(d)     Denial.  The Authority, when it does not license an Applicant shall notify the Applicant in writing, provide the basis for the denial of the License, and otherwise comply with the procedural requirements of section 4.17 of this Ordinance.

(e)     Term.  Any License issued pursuant to this Section shall be effective for a period of two (2) years from the date of issuance.  A temporary License may be issued for such period of time as determined by the Authority, but not to exceed sixty (60) days, with a possible sixty-(60)-day renewal for cause.

(f)     License Substance and Classification.  The License shall bear on its face the name of the Licensee, the Tribal Logo, the issue date, the license number, and the applicable classification of the License.  Subject to this Ordinance, the Authority may issue Licenses that authorize a Licensee to provide all types of consumer financial services under this Ordinance or a limited-purpose License that only authorizes certain types of consumer financial services under this Ordinance.  Each License shall specify its scope.

(g)     Record Retention.  The Authority shall maintain the Applicant's file, including applications, background investigation reports, and eligibility determination reports for no less than three (3) years from the date of termination of employment.

(h)     License Posting.  A license issued pursuant to this Ordinance shall be conspicuously posted at the Licensee's place of business and on each of its websites.

5.4     Application Denial; Suspension or Revocation of License.

(a)     Denial; Suspension or Revocation. The Authority shall not   unreasonably withhold issuance or renewal of a License. The Authority shall deny an Application, or suspend or revoke a License, only after notice and an opportunity for a hearing pursuant to Section 4.17 herein, unless the Authority finds that an Applicant or Licensee:

-18-

(1)     Failed to pay Application or renewal fees;

(2)     Made a material misstatement or omission on the Application or on any document required to be filed with the Authority;

(3)     Withheld or provided incomplete or insufficient pertinent information from the Authority;

(4)     Is not a Person of honesty, truthfulness or good character;

(5)     Violated or aided, abetted, or conspired or knowingly caused any Licensee or Person to or otherwise participate in the violation of this Ordinance or the rules and regulations of the Authority;

(6)     Participated in Consumer Financial Services in violation of this Ordinance;

(7)     Knowingly falsified books or records that relate to a transaction connected with the operation of Consumer Financial Services or Debt Collection Activities;

(8)     Failed to keep sufficient books and records to substantiate receipts, disbursements, and expenses incurred or paid by a Licensee authorized pursuant to this Ordinance or to substantiate, by the Authority, compliance with this Ordinance;

(9)     Failed to take reasonable measures to ensure that an agreement with a Consumer is not materially breached;

(10)    Is insolvent;

(11)    Is charged, has been convicted, or has entered a plea of no contest in any jurisdiction with a felony or any other crime involving breach of trust or dishonesty;

(12)    After notice and an opportunity to be heard, has been found by an administrative agency of any jurisdiction responsible for conduct that involved fraud, deceit or misrepresentation ;

(13)    Has had a financial judgment ordered against it in a civil action based on fraud, deceit or misrepresentation;

(14)    Employed any Person in whom the Licensee knew or should have known was convicted of fraud, theft, or embezzlement;

(15)    Refused to comply with any lawful order, inquiry or directive of the Authority, the Tribal Council, the Tribal Court;

(16)    Attempted to bribe or offer something of value to any Person, Tribal Council member, or an Agent in an attempt to avoid or circumvent the law;

(17)    Stole or attempted to steal funds or other items of value;

-19-

(18)    Poses a threat to the public interest or the effective regulation of Tribal Consumer Financial Services or Debt Collection Activities;

(19)    Creates or enhances the danger of unsuitable, unfair or illegal practices and methods and activities in the conduct of Tribal Consumer Financial Services or Debt Collection Activities;

(20)    Has had a License suspended or revoked and not subsequently reinstated; or

(21)    Has demonstrated an inability to manage personal or business finances or demonstrates a sufficient indebtedness in relation to income so as to cause concern for the ability to fulfill its responsibilities under this Ordinance.

(b)    Acts of Controlling Persons.  It is sufficient cause for denial of an Application or the suspension or revocation of a License if an officer, director, partner, employee or controlling person of the Licensee or Applicant acted or failed to act in a manner that would be cause for denial, suspension or revocation. For purposes of this subsection, "controlling person" means a person described in subsection 5.2(b)(1) or who has the ability to affect one or more significant business decisions of the Licensee or Applicant

(c)    Procedure for Suspension or Revocation.

(1)    Upon reasonable basis for belief that a violation of the Ordinance has occurred, the Authority may issue a violation notice or serve an order to show cause why the Licensee's License should not be suspended or revoked

(2)    Any violation notice or order to show cause shall state the reason for the violation or order and the time and place for the hearing before the Authority pursuant to Section 4.17 herein.

5.5    Renewal.

(a)    Renewals.  A Licensee shall apply to renew a License before the License expires. Applicants may be required to provide updated material as requested.

(b)    Non-renewal.  The Authority may deny renewal of a License if the Authority finds the existence of any circumstance listed in section 5.4(a) above, or that any other fact or condition exists that, if it had existed at the time of the original application for the License, would have warranted the Authority to refuse to issue the License.

5.6    Voluntary Surrender of License. Any Licensee may voluntarily surrender its License at any time by giving written notice of the surrender to the Authority.

5.7    Assignment or Transfer. A License is not salable, lendable, transferable or assignable and control of a License shall not be acquired through any stock purchase or other devise.

5.8   Deposits of Fees and Assessments. Application fees, renewal fees, late payment penalties, civil penalties, administrative fines and other fees or penalties provided for in this Ordinance shall in all cases be paid directly to the Authority. The Authority shall deposit such proceeds into an account or fund designated by the Tribal Council.

## SECTION 6. EXEMPTIONS

6.1   The following Persons are subject to sections 7.1 and 7.2 but otherwise exempt from any other provision or application of this Ordinance:

(a)   A Person who engages in Consumer Financial Services without charging or collecting interest or other consideration for a transaction or charges or collects nominal or incidental consideration.

(b)   A Vendor that receives less than Twenty-Five Thousand Dollars ($25,000) in any twelve (12) month period from a Licensee.

(c)   A Person who is a bank, savings bank, or savings and loan association organized under the laws of the United States, or any other lender to the Tribe or to a Financial Services Licensee or Debt Collation Licensee.

(d)   A Person who provides financial services to a Licensee and who is licensed, registered, or otherwise subject to the regulatory supervision and oversight of an agency of the United States in order to engage in such financial services.

(e)   A Person licensed or otherwise authorized to engage in payment processing, money transmission, tax preparation, or the practice of law.

(f)   Any Person providing solely pre-origination services including but not limited to credit bureaus, lead generators, marketing companies, or similar third-party service providers as identified by promulgated regulation.

(g)   Any other federal insured financial institution and any of their subsidiaries;

(h)   Any employee of the above.

## SECTION 7. LICENSEES

7.1   Compliance. Licensees shall at all times comply with the provisions of this Ordinance, rules and regulations promulgated pursuant to this Ordinance, and all other applicable Tribal, and federal laws as applicable.

7.2   Federal Consumer Protection Laws.   A Licensee shall conduct business in a manner consistent with principles of federal consumer protection law, including, without limitation, the following, as applicable: Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5491-5493; Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and related regulations at 12 C.F.R. Part 226; Consumer Leasing Act, 15 U.S.C. §§ 1667 *et seq.*, and related regulations at 12 C.F.R. Part 213; Fair Credit Billing Act, 15 U.S.C. § 1666a; Equal

Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and related regulations at 15 C.F.R. Part 202; Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*, and related regulations at 12 C.F.R. Part 205; Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* and related regulations at 12 C.F.R. Part 222); privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*, and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314; Fair Debt Collection Practices Act , 15 U.S.C. § 1692 *et seq.*, and related regulations at 16 C.F.R. Part 901; Talent Amendment, 10 U.S.C § 987, and related regulations of the Department of Defense at 32 C.F.R. part 232; Military Lending Act, 10 U.S.C. § 987; and Service members' Civil Relief Act, 50 U.S.C. App. §§ 501-596.

      7.3     Prohibited Acts by Licensees.

      (a)     Unless otherwise exempt, a Person shall not engage in the business of Consumer Financial Services or Debt Collection Activities subject to this Ordinance without first obtaining a License pursuant to this Ordinance. A separate License is not required for each location that the Licensee operates and deals in person with the Consumers, but each location must be approved in advance by the Authority. The Financial Services or Debt Collection Licensee shall post its License issued pursuant to this Ordinance at each location or, if the location is a website, said License shall be posted electronically on each website.  For purposes of this section, the term "location" or "a location" includes a website maintained for the purpose of participating in Consumer Financial Services or Debt Collection Activities pursuant to this Ordinance.

      (b)     A Licensee shall not:

           (1)     Assess any interest, fee, or charge that is greater than any applicable limitation, if any, prescribed in this Ordinance.

           (2)     Use or cause to be published or disseminated any advertisement that contains false, misleading or deceptive statements or representations.

           (3)     Engage in unfair, deceptive or fraudulent practices.

           (4)     Tie or otherwise condition the providing of Consumer Financial Services or Debt Collection Activities to the sale of any good or service by the Licensee.

      7.4     Compliance Management System.

      (a)     Each Financial Services and Tribal Debt Collection Licensee shall maintain a system to ensure compliance with applicable consumer protection laws, *e.g.*, Section 7.2 above.

      (b)     Each Financial Services Licensee and Tribal Debt Collection Licensee shall provide compliance management audits to the Authority.  Compliance audits shall be provided annually.

      7.5     Books, Accounts and Records, Examinations, Costs.

(a)     Every Financial Services and Debt Collection Licensee shall maintain at each location at which it conducts business all books, accounts and records that the Authority reasonably requires.  Each Financial Services and Debt Collection Licensee shall:

(1)     Ensure that the books, accounts and records are sufficiently detailed to comply with the Ordinance and all applicable Tribal and federal laws.

(2)     Maintain the books, accounts and records separately from any other business in which the Licensee is engaged and shall retain the books, accounts and records for at least three years.

(b)     The Authority may examine or cause to be examined each Financial Services and Tribal Debt Collection Licensee annually.  In conducting such examination, the Authority may examine the books, accounts and records to determine if the Financial Services or Tribal Debt Collection Licensee has complied with this Ordinance and any implementing regulations adopted pursuant to this Ordinance. The Financial Services or Tribal Debt Collection Licensee shall pay the cost of the examination as may be required by the Authority in accordance with its regulations.

(c)     The books, accounts, and records kept by a Licensee are Tribal records and the examination, publication, and dissemination of any such books, accounts, and records are governed by the provisions of this Ordinance unless otherwise preempted by applicable Tribal law.

7.6     Audit Requirements.  The Authority may promulgate regulations to require each Financial Services Licensee and Tribal Debt Collection Licensee to provide internal audits as well as other third-party audits deemed necessary for the effective regulation of Consumer Financial Services and Debt Collection Activities.  Any such regulation shall detail the content of each required audit and auditing standards.

7.7     Public Notice.   Each Financial Services and Debt Collection Licensee shall have a copy of this Ordinance and any implementing regulations readily available for inspection by any person at each authorized consumer financial services location.  For purposes of this Section 7.7, the term "location" includes a website maintained for the purpose of participating in Consumer Financial Services or Debt Collection Activities pursuant to this Ordinance.

## SECTION 8. AUTHORIZED CONSUMER FINANCIAL SERVICES TRANSACTIONS AND DEBT COLLECTION ACTIVITIES

8.1     General Authority.   Subject to this Ordinance, a Licensee may engage in the business of providing Tribal Consumer Financial Services as provided in this Ordinance.

8.2     Revolving Credit.

(a)     Applicability, Exempted Transactions.  This subchapter applies to revolving lines of credit. This subchapter does not apply to the following:

(1)    Credit transactions involving extensions of credit primarily for business or commercial purposes; and

(2)    An extension of credit to any Person other than a natural person.

(b)    Definitions.  In this subchapter, unless the context otherwise requires:

(1)    "Consumer's Account" means an account established by a Consumer with a Creditor under a Revolving Credit Plan.

(2)    "Creditor" means a Financial Service Licensee issuing a Loan to Consumer under the laws of the Tribe and pursuant to this Ordinance.

(3)    "Deposit Account" means a demand deposit account or a savings account established at a financial institution by a Consumer, or person acting on behalf of or with authorization from the Consumer, for the purpose of receiving deposits of funds as more fully described in the agreement governing the Plan.

(4)    "Loan" or "Loans" means cash advances or loans to be made from time to time pursuant to the terms of the agreement governing the Plan.

(5)    "Outstanding Unpaid Indebtedness" or "Indebtedness" means on any day an amount not in excess of the total amount of Loans charged to the Consumer's Account under the Plan which is outstanding and unpaid at the end of the day, after adding the aggregate amount of any new Loans charged to the Consumer's Account as of that day and deducting the aggregate amount of any payments and credits applied to that indebtedness as of any day and, if the agreement providing the Plan so provides, may include the amount of any interest and additional charges, including late or delinquency charges, which have accrued to the Consumer's Account and which are unpaid at the end of the day.  Loans may be included in Outstanding Unpaid Indebtedness as of such time as may be specified in the agreement governing the Plan.

(6)    "Pre-paid Card" means a debit card or other access device, upon which the proceeds of a Loan issued pursuant to the terms of a Revolving Credit Plan are added and which is contemplated by the agreement governing the Plan.

(7)    "Revolving Credit Plan" or "Plan" means a plan contemplating the extension of credit under an account governed by an agreement between a Creditor and a Consumer pursuant to which:

A.    The Creditor permits the Consumer and, if the agreement governing the Plan so provides, Persons acting on behalf of or with authorization from the Consumer, from time to time to obtain Loans to be deposited into the Consumer's Deposit Account or to a Pre-paid Card issued in connection with the Plan;

B.    The amounts of such Loans are charged to the Consumer's Account;

-24-

C.      The Consumer is required to pay the Creditor the amounts of all Loans charged to such Consumer's Account under the Plan but has the privilege of paying such amounts outstanding from time to time in full or over time and can reborrow and repay in accordance with the agreement governing the Plan;

D.      Interest may be charged and collected by the Creditor from time to time on the Outstanding Unpaid Indebtedness under such Plan; and

E.      Fees may be charged and collected by the Creditor from time to time for Loans, services, activity on the Consumer's Account, or other privileges offered under the Plan.

(c)      Extension of Credit.  Any Creditor may offer and extend credit under a Revolving Credit Plan to a Consumer and in connection therewith may charge and collect the interest and other charges permitted by this subchapter as may be acceptable to the Creditor.

(d)      Interest.  A Creditor may charge and collect interest under a Revolving Credit Plan on Outstanding Unpaid Indebtedness in the Consumer's Account under the Plan at such daily, weekly, monthly, annual or other periodic percentage rate or rates as the agreement governing the Plan provides or as established in the manner provided in the agreement governing the Plan subject to the maximum interest rate prescribed herein.

(1)      Periodic interest may be calculated using any method provided for under the Plan.  Periodic billing cycles may be established in such manner and shall have such duration as may be specified in the agreement governing the Plan.

(2)      Maximum Interest Rate.  No Creditor may charge an interest rate under the Plan in which the scheduled finance charges exceed fifty dollars ($50.00) per one hundred dollars ($100.00) of principal per billing cycle. The finance charge may be calculated, earned and scheduled for payment as agreed by the parties as long as the finance charges as originally scheduled for payment do not exceed the maximum allowable amount set forth herein.

(e)      Additional Charges.

(1)      In addition to or in lieu of interest at a periodic percentage rate or rates as provided in this Ordinance, a Creditor may, if the agreement governing the Revolving Credit Plan so provides, charge and collect any other fees or charges, costs, points, premiums and all other expenses which may be assessed by the Creditor in connection with the Plan.   All such fees must be disclosed and approved pursuant to the requirements of this Ordinance to Consumers before any Loan may be issued to a Consumer.

(2)      A Consumer may pay the Outstanding Unpaid Indebtedness charged to the Consumer's Account under a Plan in full at any time.  A Creditor may not impose any

-25-

prepayment charges in connection with the payment of Outstanding Unpaid Indebtedness in full by a Consumer.

(f)     Delinquent Installments.  If the agreement governing a Revolving Credit Plan so provides, a Creditor may impose a late or delinquency charge upon any outstanding unpaid installment payments or portions thereof under the Plan which are in default; provided, however, that no more than one (1) such late or delinquency charge may be imposed in respect of any single such installment payment or portion thereof regardless of the period during which it remains in default; and provided further, however, that for the purpose only of the preceding provision all payments by the Consumer shall be deemed to be applied to satisfaction of installment payments in the order in which they become due.  Nothing contained in this section shall limit, restrict or otherwise affect the right of a Creditor under and pursuant to subsections (c) and (d) of this subchapter to change the periodic percentage rate or rates of interest applicable to the Revolving Credit Plan between the Creditor and a Consumer upon the occurrence of a delinquency or default or other failure of the Consumer to perform in accordance with the terms of the Plan.

(g)     Omitted Installments.  A Creditor may at any time and from time to time unilaterally extend to a Consumer under a Revolving Credit Plan the option of omitting monthly installments.  Any and all required disclosures must be made to a Consumer upon a change to the term of any Loan or Plan.

(h)     Billing Error Resolution.  A Creditor shall comply with the requirements of this Ordinance, currently in effect, regarding the resolution of billing errors.

(i)     Attorneys' Fees; Costs.  In the event a Consumer defaults under the terms of a Plan, the Creditor may, if the Consumer's Account is referred to an attorney (not a regularly salaried employee of the Creditor) or to a third party for collection and if the agreement governing the Revolving Credit Plan so provides, charge and collect from the Consumer a reasonable attorneys' fee or the fee charged by any third party to collect the amount due.  In addition, following a Consumer's default, the Creditor may, if the agreement governing the Plan so provides, recover from the Consumer all court, alternative dispute resolution or other collection costs (including, without limitation, fees and charges of collection agencies) actually incurred by the Creditor.

(j)     Application of Other Laws.

(1)     Any federal law not applicable to Indian tribes or state law limiting the rate or amount of interest, discount, points, finance charges, service charges or other charges which may be charged, taken, collected, received or reserved shall not apply to extensions of credit under a Revolving Credit Plan operated in accordance with this subchapter.

8.3     Consumer Small Dollar Loans.

-26-

(a)    Applicability, Exempted Transactions.  This Section applies to Small Dollar Loans which are not secured by real property or a dwelling. This subchapter does not apply to the following:

(1)    Credit transactions involving extensions of credit primarily for business or commercial purposes; and

(2)    An extension of credit to any Person other than a natural person.

(b)    Definitions.

(1)    "Business day" means, with respect to rescission as used in this Section 8.3, all calendar days except Sundays and legal public holidays.

(2)    "Conspicuously displayed" means highlighted through the use of capitalization, bold print, underlining or some combination thereof.

(3)    "Creditor" means a Financial Services Licensee lending money under the laws of the Tribe through this Ordinance.

(4)    "Loan" means any single extension of credit including Short-Term Consumer Loans and Small Dollar Consumer Loans.

(5)    "Right of rescission" means, with respect to any short-term consumer loan, the right to return any amount borrowed, in full, on or before the close of business of the business day following the day on which such sum has been disbursed or advanced without the incursion of any fee or other charges.

(6)    "Rollover" means, with respect to any short-term consumer loan, the extension of an outstanding and unpaid indebtedness beyond the stated repayment period solely on the basis of the payment of a fee without approval of a new loan application.

(7)    "Short-Term Consumer Loan" means a Small Dollar Loan for which the stated repayment period is less than sixty (60) days.

(8)    "Small Dollar Consumer Loan" means an unsecured loan in the amount of at least fifty dollars ($50.00) but not more than five thousand dollars ($5,000.00), excluding finance charges, fees and other charges permitted in this Ordinance.

(9)    "Workout Agreement" means an agreement between an individual Consumer and a Creditor for the repayment of an outstanding and unpaid indebtedness which requires a net reduction of not less than 10% of such indebtedness per payment period.

(c)    Extension of Credit.  Any Creditor may, subject to any limitations imposed by this Ordinance, offer and extend closed end credit to a Consumer and, in connection therewith, may charge and collect the interest and other charges permitted by this Section.

-27-

(d)     Interest.  A Creditor may charge and collect interest in respect of a Loan at such daily, weekly, monthly, annual or other periodic percentage rate or rates as the agreement governing the loan provides subject to the maximum allowable interest rate required by this Ordinance.

(1)     Maximum Allowable Interest Rate.  A Creditor may not enter into a Loan transaction with a consumer in which the scheduled finance charges exceed fifty dollars ($50.00) per one hundred dollars ($100.00) of principal per installment period. The finance charge may be calculated, earned and scheduled for payment as agreed by the parties as long as the finance charges as originally scheduled for payment do not exceed the maximum allowable amount set forth herein.

(e)     Variable Rates.  If the agreement governing the loan so provides, the periodic percentage rate or rates of interest charged and collected in respect of the loan may, if the interest is not pre-computed and taken in advance, vary in accordance with a schedule or formula. Such periodic percentage rate or rates may vary from time to time as the rate determined in accordance with such schedule or formula varies and such periodic percentage rate or rates, as so varied, may be made applicable to all or any part of outstanding unpaid amounts of such loan on and after the effective date of such variation. This Section shall not be construed to limit the authority of a Creditor to charge and collect interest in respect of a loan in the manner and at the rate or rates authorized in any other section of this subchapter. Without limitation, a permissible schedule or formula hereunder may include provisions in the agreement governing the loan for a change in the periodic percentage rate or rates of interest applicable to all or any part of outstanding unpaid amounts whether by variation of the then applicable periodic percentage rate or rates of interest, variation of an index or margin or otherwise, contingent upon the happening of any event or circumstance specified in the loan agreement, which event or circumstance may include the failure of the Consumer to perform in accordance with the terms of the loan agreement.

(f)     Additional Charges.  In addition to or in lieu of interest at a periodic percentage rate or rates permitted by this Section, the Creditor may charge and collect:

(1)     If the agreement governing the Loan so provides, charge and collect any other fees or charges, costs, points, premiums and all other expenses which may be assessed by the Creditor in connection with the Loan.

(2)     If the agreement governing a Loan so provides, a Creditor may impose, as interest, a late or delinquency charge upon any outstanding unpaid installment payments or portions thereof under the loan agreement which are in default; provided, however, that no more than one (1) such delinquency charge may be imposed in respect of any single such installment payment or portion thereof regardless of the period during which it remains in default. Nothing contained in this Section shall limit, restrict or otherwise affect the right of a Creditor under and pursuant to this Section to change the periodic percentage rate or rates of interest applicable to the loan agreement between the Creditor and a Consumer upon the occurrence of a delinquency or default or other failure of the

Consumer to perform in accordance with the terms of the loan agreement provided that such changes and variances are disclosed to and approved by the Consumer;

(3)     Such other charges as are set forth in the agreement governing the Loan including, but not limited to, costs, fees, services, points, premiums and all other reasonable expenses which may be incurred by such applicant in connection with a loan. No Creditor shall demand, collect or receive from any applicant for a loan, directly or indirectly, any other charges, or any greater amounts for any authorized charges than those permitted by this subchapter.

(g)     Deferred Installments. A Creditor may at any time or from time to time permit a Consumer to defer installment payments of a Loan and may, in connection with such deferral, charge and collect deferral charges and may also require payment by such Consumer of the additional cost to the Creditor of premiums for continuing in force, until the end of such period of deferral, any insurance coverage provided in connection with the loan pursuant to this Section.

(h)     Refinancing.

(1)     A Consumer may, with the consent of the Creditor, refinance the entire outstanding and unpaid amount of a Loan, and the Creditor may charge and collect a refinancing charge in connection with any such refinancing.

(2)     For the purposes of this Section, the entire outstanding and unpaid amount of a Loan shall be deemed to be the total of the unpaid balance and the accrued and unpaid interest and charges on the date of refinancing.

(i)     Number of Loan transactions at one time. A Creditor may enter into no more than three (3) Loans with any consumer at any time.

(j)     Duration.     A Creditor may not provide Loan transactions, whether Short Term Consumer Loans or Small Dollar Consumer Loans for a term of less than three (3) days or more than forty-eight (48) months.

8.4.     Short-Term Consumer Loans.

(a)     In addition to such other limitations and requirements as are imposed pursuant to other provisions of this Section, Short-Term Consumer Loans shall be subject to the following:

(b)     No Creditor shall make more than four (4) rollovers of an existing Short-Term Consumer Loan. After the fourth rollover, the Creditor must enter into a Workout Agreement with the Consumer that allows for the pay down of at least five (5) percent of the principal of the Loan per month over a maximum forty eight (48) month period or take such other actions as are lawful to collect any outstanding and unpaid indebtedness.

(c)     No Creditor shall make a Short-Term Consumer Loan unless such Loan is subject to a right of rescission on the part of the individual Consumer.

-29-

(d)     No Creditor shall pursue or threaten to pursue criminal action against an individual Consumer in connection with the nonpayment of any amount due, including the unpaid return of any check or automated clearing house transaction.

(e)     In addition to such other disclosure requirements as are imposed pursuant to other provisions of this Section, Loans shall be subject to the following: No Creditor shall make a Loan unless the application for such Loan contains a written disclosure, conspicuously displayed, that:

(1)     The loan is designed as a short-term cash flow solution and not designed as a solution for longer term financial problems; and

(2)     Credit counseling services are available to consumers who are experiencing financial problems.

(f)     Nothing in this Section prohibits a Creditor from refinancing the principal amount of a Loan, subject to the limitations and requirements imposed herein.

(g)     Every Loan provider must post, in plain view on all of its websites, a schedule of fees and rates applicable to their loans, and a prominent statement that: "A small dollar consumer loan is not intended to meet long-term financial needs."

(h)     Attorneys' Fees; Costs.  In the event a Consumer defaults under the terms of a loan, the Creditor may, if the Consumer's account is referred to an attorney (not a regularly salaried employee of the Creditor) or to a third party for collection and if the agreement governing, or the bond, note or other evidence of, the loan so provides, charge and collect from the Consumer a reasonable attorney's fee. In addition, following a Consumer's default, the Creditor may, if the agreement governing, or the bond, note or other evidence of, the loan so provides, recover from the Consumer all court, alternative dispute resolution or other collection costs (including, without limitation, fees and charges of collection agencies) actually incurred by the Creditor.

(i)     Application of Other Laws.

(1)     Any federal law not applicable to Indian tribes or state law limiting the rate or amount of interest, discount, points, finance charges, service charges or other charges which may be charged, taken, collected, received or reserved shall not apply to extensions of credit under a Loan operated in accordance with this subchapter.

(2)     No oral agreements.  A Consumer Financial Services transaction may provide that it represents the entire agreement of the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  Such provisions are enforceable and disallow evidence of oral agreements.

-30-

(3)     Enforcement of Creditor's rights and remedies.  In any proceeding in which a Licensee is a party in interest with respect to any transactions with a consumer, the Licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written transaction documents and the payment and business records maintained by the Licensee in the ordinary course of business.

8.5     Debt Collection Activities Authorized, Certain Acts Prohibited.

(a)     The Tribe hereby authorizes Debt Collection Activities conducted by any Tribal Debt Collection Licensee that is a duly formed tribally-owned entity or instrumentality or any Debt Collection Licensee  provided such Debt Collection Activities are, at all times, conducted within the bounds of applicable Tribal and federal law.

(b)     Collection Efforts.  This Ordinance allows for Debt Collection Activities as such pertain to consumer lending, both lending by the Tribe, its economic arms and instrumentalities, and others who issue debt available for purchase.  The Tribe, through its duly formed tribally-owned entity or instrumentation may endeavor to engage in Debt Collection Activities.  The following activities are expressly prohibited:

(1)     Harassment, oppression, or abuse of Consumers or other third parties in connection with the collection of Receivables; and

(2)     Unfair, deceptive, or abusive practices related to the Debt Collection Activities.

(c)     Prohibited Acts.  In addition to other civil and criminal acts that may be regulated or prohibited by this Ordinance, other Tribal law or applicable federal law, the following shall constitute prohibited activities and unauthorized Debt Collection under this Ordinance and shall subject any perpetrator to action, including, but not limited to, the imposition of civil penalties and referral to appropriate law enforcement authorities for criminal proceedings:

(1)     Altering or misrepresenting Debt Collection documents;

(2)     Defrauding the Tribe, any duly formed tribally-owned entity or instrumentality, or Consumer;

(3)     Participating in any Debt Collection Activities not authorized by this Ordinance;

(4)     Knowingly providing false or misleading information, making any false or misleading statement, or failing to disclose a material fact to the Tribe, any duly formed tribally-owned entity or instrumentality , or its agents in connection with any contract for services or property related to Debt Collection Activities;

-31-

     (5)    Falsifying, destroying, erasing or altering any books, computer data, records, or any other information related to Debt Collection Activities; and

     (6)    Misappropriating confidential information.

## SECTION 9. ENFORCEMENT

    9.1   <u>Jurisdiction</u>. Except as provided otherwise in this Ordinance, the Authority shall have jurisdiction over all violations of this Ordinance.

    9.2   <u>Civil Violations</u>. Any Licensee or Person who violates or fails to comply with any provision of this Ordinance or who fails or neglects to comply with any final order of the Authority may be charged with a violation and given due process pursuant to Section 4.17.

    9.3   <u>Civil Fines</u>. Any Licensee or Person is found to have committed a violation may be required to pay a civil fine to the Authority not to exceed five thousand dollars ($5,000.00) for each violation. Each day during which any such violation or failure to comply continues may be treated as a separate violation of this Ordinance, however the penalty shall not exceed one hundred thousand dollars ($100,000.00). A violation or series of violations related to the same act or omission may be treated as one violation.

    9.4   <u>Cumulative Fines</u>. All civil fines accruing under this Ordinance shall be cumulative and a suit for the recovery of one fine shall not bar or affect the recovery of any other fine, or judgment, penalty, forfeiture or damages nor bar the power of a court of competent jurisdiction to enter an order of contempt, nor bar any criminal prosecution against any officer, director, agent, or employee of any Licensee, or any other Person.

    9.5   <u>Purpose of Civil Penalties</u>. The civil fines imposed under this Ordinance are intended to be remedial and not punitive and are designed to compensate the Tribe for the damage done to the peace, security, economy and general welfare of the Tribe, and to compensate the Tribe for costs incurred by the Tribe in enforcing this Ordinance. The civil fines under this Ordinance are also intended to coerce all people into complying with this Ordinance and Authority regulations and not to punish such people for violation of such laws and regulations.

    9.6   <u>Guidelines</u>. In imposing any administrative remedy or civil penalty provided for in this Ordinance, the Authority shall take into account the appropriateness of the remedy or penalty with respect to the size of the financial resources and good faith of the Financial Services Licensee or Debt Collection Licensee charged, the extent to which the violation was intentional, the gravity of the violation, the history or previous violations, and such other matters as justice may require.

    9.7   <u>Civil Action for Penalties</u>. In enforcing the civil infraction provisions of this Ordinance, the Authority may proceed, in the name of the Tribe against a Person for violation of such provision by civil complaint in a court of competent jurisdiction pursuant to the provisions of this Ordinance.

9.8     Seizure and Forfeiture of Property.   Property utilized in violation of this Ordinance shall be subject to seizure and forfeiture by order of the Authority pursuant to such implementing regulations as the Authority shall promulgate.

## SECTION 10.  RESOLVING CONSUMERCONSUMER DISPUTES

10.1.   General Principles. The Tribe values its customers and intends, at all times, to see that questions, concerns, issues, and/or disputes raised by consumer Consumers are addressed in a fair and orderly manner. However, nothing in this Section shall be construed as a waiver of the Tribe's or the Financial Services Licensee's or Tribal Debt Collection Licensee's sovereign immunity or any of the rights and privileges attendant thereto.

10.2.   Initial Dispute Resolution Procedure.

(a)     Consumers who, in the course of their otherwise lawful and proper use of a Licensee's business, have concerns about the operation of any part of the Licensee's operation that pertain to the Consumer or who otherwise believe themselves to be aggrieved by some aspect of the operation of any part of the Licensee's business, shall direct their concerns or dispute in the first instance to the management of the Licensee, either orally or in writing.

(b)     The Licensee shall also expediently gather sufficient facts to make a determination about the dispute.  The Licensee shall inform the complainant, either orally or in writing, about its initial determination as soon as is reasonably practicable.  If the Consumer concern or dispute is unresolved through the initial dispute resolution procedure, then a Licensee shall notify the Consumer in writing of his or her right to contact the Authority about the dispute and his or her rights to pursue formal dispute resolution under Section 10.3 of the Ordinance.

10.3   Formal Dispute Resolution Procedure.

(a)     In the event of a Consumer dispute, complainants who have followed the initial dispute resolution procedure described in Section 10.2 and who are dissatisfied with a Licensee's initial determination, may request review of the initial determination by the Licensee by submitting a request to the Authority in writing no later than ninety (90) days after being informed about the initial determination by the Licensee.  The Consumer's written request must include the following information:

(1)   The consumer's full name, as it appears on the consumer's loan contract, as well as the consumer's address, email address, and phone number.

(2)   A copy of the consumer's loan agreement, or otherwise identify the loan agreement.

(3)   A copy of the Licensee's determination.

(4)   A written request that summarizes with specificity the events and circumstances giving rise to the alleged wrongful action or inaction of the

Financial Services Licensee or Tribal Debt Collection Licensee and the relief requested.

(5)   A statement requesting a review hearing before the Authority. If a hearing is requested, the consumer must indicate whether he will appear personally or if he would prefer to appear by telephone. The consumer must also indicate whether he will be represented by an attorney or if he will represent himself.

(6)   Any other information the consumer feels may be relevant to the complaint or that may assist the Authority evaluate the complaint.

(b)   The Authority shall investigate the dispute in any manner it chooses. The Authority may offer the complainant a fair opportunity to be heard regarding the dispute, in person or through telephonic conference, either before or after the Authority makes its own inquiries. A complainant may be represented by legal counsel at the Consumer's own expense. The complainant's opportunity to be heard, if granted, shall take place, except as determined by the Authority, no less than ten (10) days and no more than sixty (60) days after the Authority receives the complainant's written request. In connection with a dispute, the Authority may conduct and issue such review, interviews, sworn statements, depositions, and other discovery as the Authority requests. In each instance, the Licensee, complaint and other interested persons must cooperate with the Authority and provide such information and documents as the Authority deems necessary or advisable to make a determination.

(c)   After reviewing and/or investigating (if the Authority chooses), and within thirty (30) days after affording the complainant an opportunity to be heard, the Authority shall issue a written opinion on the complainant's written request for review, and shall mail a copy of the opinion to the complainant at his or her last known address. The Authority shall consider all applicable Tribal and federal law in its opinion. The Authority may grant or deny a Consumer complaint and grant or deny such relief, if any, as the Authority determines in its sovereign discretion. The opinion shall inform the complainant that he or she may appeal the Authority's decision as set forth in this Section.

(d)   A complainant may appeal an Authority opinion by filing a written appeal to the Tribal Court within twenty (20) days of receiving the Authority's final written decision in accordance with current rules of court and procedure of the Lac du Flambeau Tribal Court. A Tribal Court review of any Authority opinion shall consider any applicable Tribal and federal law and regulation.

(f)   The Tribal dispute resolution process authorized under this Ordinance is considered by the Tribe to constitute a petition for redress submitted to a sovereign government, without waiver of sovereign immunity or exclusive jurisdiction, and does not create any binding procedural or substantive rights for a complainant.